Paul M. McMANUS, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 82S00–0104–DP–188.

Supreme Court of Indiana.

Aug. 31, 2004.

· Timothy R. Dodd, John P. Brinson, Evansville, IN, Attorneys for Appellant.

Steve Carter, Attorney General, Scott A. Kreider, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Paul Michael McManus was convicted of three counts of murder and sentenced to death. He challenges the constitutionality of Indiana's death penalty statute and argues that his conviction is invalid due to evidentiary errors and his incompetence to stand trial. We affirm the conviction and sentence.

### Facts and Procedural History

On February 26, 2001, Paul McManus murdered his wife and two children. Prior to the murders, McManus separated from his wife and was arrested for domestic battery. In the course of the battery, he threatened to kill "everyone." During the weeks immediately preceding the murders, McManus spoke of suicide and killing his family.

On the morning of February 26, 2001, McManus's wife served him with divorce

papers. That same day, McManus took a taxi to a gun store, purchased ammunition, and retrieved a handgun from his brother's house. At about 7:45 p.m., McManus entered his wife's house and shot her once in the leg and three times in the head. He then shot his eight-year-old daughter three times in the head and his two-year-old daughter once in the head.

Police investigators later retrieved a cassette tape recorded by McManus. The transcript of the cassette reads in part:

> Well, if you're listening to this tape, I guess I've done what I had to do. I don't expect you guys to understand, but I had to do it.... I want you to make sure that I am buried with my kids and my wife. No matter what, I want you to make sure that happens.

Tr. at 701.

On February 27, 2001, the State filed a three-count information alleging that McManus knowingly killed his wife and two daughters,[1] and later amended it to request the death penalty.[2] On May 7, 2001, McManus filed a notice of intent to assert the defense of insanity.

Voir dire commenced on April 24, 2002, and the trial began on April 29th. On the 29th, McManus displayed symptoms of a panic attack, and the trial court granted him a recess until the following day. The next day, McManus again became ill and moved for a continuance or mistrial. The trial court denied his motions, and the State continued to present evidence. On May 1st, McManus again became ill and renewed his motion for mistrial. The court continued the trial until May 8th so that a psychiatrist could examine him.

On May 6th, McManus filed a written motion for mistrial, contending that the medications as prescribed rendered him incompetent. After hearing argument, the trial court denied the motion.

On May 9th, the jury returned guilty verdicts on all three counts. The following day, the jury heard evidence in the penalty phase and returned a recommendation for death. After a subsequent sentencing hearing, the trial court found the existence of aggravating circumstances, found one mitigating circumstance, concluded that the aggravating circumstances outweighed the mitigating circumstance, and sentenced McManus to death.

On July 5, 2002, McManus filed a motion to correct errors, contending that he was incompetent to stand trial. The trial court denied his motion. McManus now appeals.

## I. Constitutionality of the Death Penalty Statute

■ McManus challenges the constitutionality of the version of Indiana's death penalty statute in effect at the time of his sentencing, claiming that it violates the Sixth and Eighth Amendments to the U.S. Constitution.[3] A statute is presumed constitutional; a challenger must rebut this presumption. *State v. Lombardo*, 738 N.E.2d 653 (Ind.2000).

### A. Sixth Amendment

■ McManus argues that he was denied his Sixth Amendment right to a jury trial because the Indiana death penalty statute in effect at the time of his sentencing was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he ar-

---

1. *See* Ind.Code § 35–42–1–1(1).

2. *See* Ind.Code § 35–50–2–9.

3. Indiana Code § 35–50–2–9. A new version of Indiana Code § 35–50–2–9(e) became effective July 1, 2003.

gues that under those cases the jury must find not only the aggravating circumstances, but must also find the mitigating circumstances and determine the balance between them. He says the statute is defective because the jury's finding is not the final legal event but merely a prelude to the judicial finding contained in the court's sentencing order.

Under Indiana's statute as it read at the time of McManus's trial, a jury could recommend death only if it found the existence of at least one statutory aggravator beyond a reasonable doubt.[4] All of our post-*Ring* case law concludes that a defendant whose jury has made such a finding has received what *Ring* and *Apprendi* require. Our re-examination of *Apprendi* and *Ring* provide us with no reason to change that interpretation.[5]

McManus makes a very similar contention about how the weighing of aggrava-tors and mitigators must occur. We have previously held that "the determination of the weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt, but is a balancing process." *Bivins v. State*, 642 N.E.2d 928, 946 (Ind.1994); *see also Wisehart v. State*, 693 N.E.2d 23, 55 (Ind.1998). After examining *Apprendi* and *Ring*, we recently re-affirmed the constitutionality of Indiana's statute against arguments substantially similar to those raised by McManus. *Ritchie v. State*, 809 N.E.2d 258 (Ind.2004).[6]

## B. Eighth Amendment

■ McManus argues that his Eighth Amendment right to be free from cruel and unusual punishment was violated because the jury was informed that its sentencing recommendation was not binding on the trial court and the sentencing deter-

---

4. Indiana Code § 35–50–2–9(k) (repealed effective July 1, 2003) states:

 Before a sentence may be imposed under this section, the jury, in a proceeding under subsection (e), or the court, in a proceeding under subsection (g), must find that:

 (1) the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances listed in subsection (b) exists; and

 (2) any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

5. *See, e.g., Ritchie v. State*, 809 N.E.2d 258 (Ind.2004); *State v. Barker*, 809 N.E.2d 312 (Ind.2004); *State v. Ben–Yisrayl*, 809 N.E.2d 309 (Ind.2004); *Williams v. State*, 793 N.E.2d 1019 (Ind.2003); *Brown v. State*, 783 N.E.2d 1121 (Ind.2003); *Wrinkles v. State*, 776 N.E.2d 905 (Ind.2002).

6. We said in *Ritchie* that "the pivotal inquiry under *Ring* and *Apprendi* is whether exposure to punishment is increased, not whether the punishment should or should not be imposed in a given case." 809 N.E.2d at 265. Consequently, we held: "Once a statutory aggrava-tor is found by a jury beyond a reasonable doubt, the Sixth Amendment as interpreted in *Ring* and *Apprendi* is satisfied.... The outcome of the weighing does not increase eligibility. Rather, it fixes the punishment within the eligible range. It is therefore not required to be found by a jury under a reasonable doubt standard." *Id.* at 268. *See also, Apprendi*, 530 U.S. at 481, 120 S.Ct. 2348 (emphasis in original) ("We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute."); *Ring*, 536 U.S. at 605 n. 5, 122 S.Ct. 2428 (quoting *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (alteration in original)) ("The factual finding in *Apprendi* extended the power of the judge, allowing him or her to impose a punishment exceeding what was authorized by the jury. [A] finding [that triggers a mandatory minimum sentence] restrains the judge's power, limiting his or her choices within the authorized range. It is quite consistent to maintain that the former type of fact must be submitted to the jury while the latter need not be.").

mination therefore lacked the heightened standard of reliability required in capital cases under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

In *Caldwell,* the prosecutor urged the jury not to view itself as responsible for determining whether the death penalty was appropriate for the defendant because the death sentence would be reviewed automatically by the state's highest court. The defendant challenged the validity of his death sentence on the grounds that these statements were inconsistent with the Eighth Amendment's need for heightened reliability in a capital case. The U.S. Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. 2633. Quoting Justice Harlan, the Court based its holding on the assumption that "jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision...." *Id.* at 329–30, 105 S.Ct. 2633 (quoting *McGautha v. California,* 402 U.S. 183, 208, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)). Belief in the truth of this assumption, the Court said, is "indispensable to ... the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 330, 105 S.Ct. 2633 (internal quotations omitted).

The Court clarified *Caldwell's* holding in *Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). In *Romano,* the defendant was found guilty of murder, and during the subsequent penalty phase, the prosecution introduced evidence of a previous conviction and death sentence. The defendant argued that the admission of the prior death sentence undermined the jury's sense of responsibility for determining the death penalty in violation of the Eighth Amendment. The Court noted that *Caldwell* was a plurality opinion and because the fifth vote was supplied by Justice O'Connor, who "concurred on grounds narrower than those put forth by the plurality, her position is controlling." *Id.* at 9, 114 S.Ct. 2004.

> Accordingly, we have since read *Caldwell* as relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. Thus, to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.

*Id.* (internal quotations omitted). Consequently, the Court held that admitting evidence about the prior death sentence did not violate *Caldwell* because the evidence was neither false at the time it was admitted nor pertained to the jury's role and because the trial court's instruction emphasized the importance of the jury's role. *Id.*

McManus argues that because the jury was instructed that its sentencing recommendation was not binding on the trial judge, it had a diminished sense of responsibility in violation of *Caldwell.* We dealt with this exact claim in *Wisehart v. State,* 693 N.E.2d 23 (Ind.1998). Citing *Romano,* we said:

> This Court previously has held that it is not unconstitutional to instruct the jury that the ultimate sentencing responsibility rests with the trial judge because such an instruction accurately reflects the requirements of Indiana law. An Indiana jury does not impose a sentence, but instead makes a sentencing recom-

mendation to the judge, who in turn decides what sentence to impose.

*Id.* at 53, 114 S.Ct. 2004 (citing *Lowery v. State*, 640 N.E.2d 1031, 1044 (Ind.1994)); *see also Wrinkles v. State*, 690 N.E.2d 1156, 1167 (Ind.1997) ("It is not error to inform the jury that its sentencing decision is a recommendation, because this is a correct statement of Indiana law."). McManus argues that *Wisehart* and *Wrinkles* cannot control this case because an "advisory jury" does not satisfy the Sixth Amendment as interpreted in *Ring*. This argument cannot survive our holding in the previous section; thus *Wisehart* and *Wrinkles* are still good law.

McManus further argues:

> It makes no difference if the reason for the diminished sense of responsibility is a result of prosecutor's misrepresentations, as in *Caldwell*, or the result of correct jury instructions, as in *Wrinkles* and in this case. If the jury's sense of responsibility is less than full, the verdict is unreliable and unconstitutional.

Appellant's Br. at 16. This argument disregards *Romano*, however, which states that "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law" to establish a *Caldwell* violation.[7] *Romano*, 512 U.S. at 9, 114 S.Ct. 2004. In addition, we note that the jury in this case not only received a correct instruction but, as in *Romano*, was impressed with the importance of its role and the gravity of its decision. The court instructed the jury that: its recommendation is a an integral part of the death penalty process and the

law requires that the trial judge give it great weight and serious consideration; the jurors "should assume that if you recommend the death penalty for Paul M. McManus, he will, in fact, be executed by the State of Indiana per your decision"; it should not rely on leniency or clemency by another authority; and if it is their unanimous decision to recommend death, "each of you must do so with the fixed assumption in your own mind that the sentence of death will be carried out." Tr. at 1746–47.

Because *Wisehart* and *Wrinkles* correctly interpret Sixth Amendment law and Eighth Amendment law, they control this case. The jury instruction correctly described Indiana sentencing procedure as it existed at that time and thus did not unconstitutionally lead the jury to "feel less responsible than it should for the sentencing decision." *Romano*, 512 U.S. at 9, 114 S.Ct. 2004.

## II. Testimony of Expert Witness Regarding Mitigation

 As a part of trial evidence, the court called Dr. Thomas Liffick as an expert witness to provide his evaluation of McManus's sanity at the time of the offense. McManus contends that the admission of Dr. Liffick's testimony is reversible error because it constituted a legal conclusion.

In a videotaped deposition played for the jury, the prosecution questioned Dr. Liffick in relevant part as follows: "[Prosecution.] As for the mental depression, the mild mental depression and the not liking to be alone, do you feel like those in

---

7. Despite McManus's invocation of *Caldwell*, his argument is more similar to one addressed in our recent opinion in *Clark v. State*, 808 N.E.2d 1183 (Ind.2004). In *Clark* we noted that the claim was not that the jury was incorrectly instructed in violation of *Caldwell*, but rather "boil[ed] down to a claim that the pre–2002 version of the Indiana Death Penal-

ty Statute was inherently defective because the jury did not consider its determination to be binding on the judge." *Id.* at 1196. We rejected this argument, however, holding that there was "no authority for the proposition that a nonbinding recommendation is inherently unconstitutional." *Id.*

any way mitigate his crime in this case?" Tr. at 1307–08. McManus objected to the question. The trial court overruled the objection, and Dr. Liffick responded as follows: "[Dr. Liffick.] You know, I—I—I just don't think that that mild degree of difficulty in the big picture to any significant degree would excuse these actions." Tr. at 1308.

Indiana Evidence Rule 704(b) reads as follows: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Dr. Liffick's testimony was in response to a question calling for a legal conclusion and inadmissible under Rule 704, and the court should have sustained the objection. Of course, an error in the admission of evidence is not ground for setting aside a conviction unless such erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties. Ind. Trial Rule 61.

Prior to Dr. Liffick, the court called Dr. David Hilton to examine McManus and evaluate his sanity at the time of the offense. Dr. Hilton testified as follows:

[W]hen we reviewed the actual symptoms he was experiencing, they didn't seem to meet the necessary criteria to call it a major depression. It was most consistent with what I would consider an adjustment disorder. He was going through a difficult time. He had an impending divorce. He was under a lot of stress. Adjustment disorders generally are not felt to be severe enough to affect a person's perception to the point of justifying an insanity defense. He also gave a long-standing history of chronic low-grade depression. He basically had described himself as being depressed to some degree all of his adult life, and that is generally felt to be consistent with a disorder called Dysthymic Disorder or Dysthymia. Again, that's not a disorder that affects a person's perception to the point that they would not be able to appreciate the wrongfulness of his or her actions.

Tr. at 1079–80. Dr. Hilton did not attempt to offer a legal conclusion. Both doctors shared the same medical opinion after evaluating McManus, and neither doctor stated that McManus's condition mitigated his crime.

The likelihood that this question and the reply weighed for much in the jury's deliberations is minimal. We find the error harmless.

### III. Administration of Medicines

Counsel for McManus have wisely focused most of their attention on questions relating to his fitness to stand trial. We have likewise given these claims careful attention. During McManus's pretrial incarceration, he was on a fourteen-month-long regimen of Elavil, an anti-depressant drug. On April 17, 2002, his anti-depressant was changed to Effexor. Seven days later, jury selection began. On April 29th, the first day of the trial, McManus reported symptoms of a panic attack requiring repeated visits to the hospital and doses of Lortab, Xanax, Versed, and morphine. The court ordered a week's continuance.

McManus contends (1) that the trial court erred by denying his motion for mistrial because the change in his anti-depressant and the subsequent administration of various drugs rendered him incompetent, (2) that the State was obligated to disclose exculpatory evidence about the medications, and (3) that the trial court erred in refusing to admit a news article discussing jurors' impressions of his demeanor during trial. We address these contentions in turn.

## A. Motion for Mistrial Due to Incompetency

During the course of the trial, McManus moved for a mistrial on numerous occasions, arguing that the various drugs, as administered, rendered him incompetent. On May 7, 2002, the trial court held a hearing on McManus's written verified motion for mistrial. It denied McManus's written motion and all oral motions. On appeal, McManus contends that the trial court erred in denying his motions because he was incompetent to stand trial.[8]

On appeal, the trial judge's discretion in determining whether to grant a mistrial is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury. We therefore review the trial court's decision solely for abuse of discretion. After all, "a mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Mickens v. State*, 742 N.E.2d 927, 929 (Ind.2001) (citations and quotation marks omitted).

Generally, "alleged errors in determination of competency are subject to the usual rules of appellate review, and are waived if the defendant proceeds to trial without objection." *Budd v. State*, 499 N.E.2d 1116, 1118 (Ind.1986). Even though McManus did not raise competency as an issue before his trial, his motion for mistrial was properly before the trial court because his alleged incompetency did not occur until after the trial commenced. We therefore review the trial court's determination that McManus was competent to stand trial and the denial of his motion for mistrial.

"To be competent at trial, a defendant must be able to understand the nature of the proceedings and be able to assist in the preparation of his defense." *Timberlake v. State*, 753 N.E.2d 591, 598 (Ind.2001). We have defined this standard as "whether or not the defendant currently possesses the ability to consult rationally with counsel and factually comprehend the proceedings against him or her." *Brewer v. State*, 646 N.E.2d 1382, 1384 (Ind.1995). "The trial and conviction of one without adequate competence is a denial of federal due process and a denial of a state statutory right as well." *Id.*

The trial court as trier of fact is vested with discretion to determine if reasonable grounds exist for believing a defen-

8. Indiana Code § 35-36-3-1 provides:

(a) If at any time before the final submission of any criminal case to the court or the jury trying the case, the court has reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, the court shall immediately fix a time for a hearing to determine whether the defendant has that ability. The court shall appoint two (2) or three (3) competent, disinterested psychiatrists, psychologists endorsed by the Indiana state board of examiners in psychology as health service providers in psychology, or physicians, at least one (1) of whom must be a psychiatrist, who shall examine the defendant and testify at the hearing as to whether the defendant can understand the proceedings and assist in the preparation of the defendant's defense.

(b) At the hearing, other evidence relevant to whether the defendant has the ability to understand the proceedings and assist in the preparation of the defendant's defense may be introduced. If the court finds that the defendant has the ability to understand the proceedings and assist in the preparation of the defendant's defense, the trial shall proceed. If the court finds that the defendant lacks this ability, it shall delay or continue the trial and order the defendant committed to the division of mental health and addiction, to be confined by the division in an appropriate psychiatric institution.

dant is competent to stand trial, and on appeal a determination by the trial court of the issue is viewed from a deferential perspective. Where the evidence is in conflict, we will normally only reverse this decision if it was clearly erroneous, unsupported by the facts and circumstances before the court and the reasonable conclusions that can be drawn therefrom.

*Id.* (citation omitted).

On the first day of trial, McManus suffered pain and symptoms of a panic attack and was transported to the hospital for treatment. On the following day, McManus again complained of pain and anxiety and was transported to the hospital, during the lunch break, where he was given Versed to calm him down, morphine for pain, and Xanax for anxiety. Before releasing him to jail personnel, Dr. Reza Mohammadi, an emergency room physician, prescribed McManus Lortab and Xanax and reported that "this man—I could not talk with him when he was in such a state of anxiety. I mean, he was—you could—you could not get any information on—from him nor could you carry on a conversation with him being so anxious." Tr. at 815. The trial court then questioned Dr. Mohammadi as follows:

[Court.] Now, let me ask you first about the medication you gave him today. Can that medication be what I would call mind altering or affect a person's mental processes?

[Doctor.] Absolutely.

[Court.] And to what extent and in what respect?

[Doctor.] Well, again, it's a broad range. Unfortunately, I cannot specifically say in one way or another, but—for example, if the medicine is given to someone who's not having any problems like this gentleman, it would probably put you to sleep and you will not be able to inter-

act, period, but when someone is as anxious as this gentleman was, it probably would bring him down to a level that he can actually communicate, and—so I would not—for example, with—just to give you an idea, with people whom we prescribe this type of medicine on, we instruct them not to drive for—within four to six hours and—because we believe it does alter their decision making and so on and so forth.

[Court.] Would he be able to think rationally?

[Doctor.] I think—I think he can think rationally now as opposed to when he was so anxious, yes.

[Court.] But the medications you gave him today, would it prevent him from thinking rationally?

[Doctor.] I would say that he would—it would alter the way he would perceive things. Now, in the spectrum of what we are dealing with today, I would say that he would be thinking more rationally now than he was when he was so anxious, if that answers your question.

[Court.] Yes. And how about the medications that you prescribed for him, the Xanax and the Lortab, how would they affect his mind and his judgment?

[Doctor.] I believe he can—he can make judgments in—if he was given enough time to make the judgment at, and again, it's a decision that if, in fact, this man is not—if his condition is not controlled, he would not be able—in the state of mind he presented today, he would not be able to answer any questions rationally, period, and now that he's on medicine, he may be—in my view, he can possibly now proceed and give some rational answers, but these medicines do alter—alter people's judgment in the vast majority of people, yes, they do.

Tr. at 816–17. On cross examination, the State questioned Dr. Mohammadi as follows:

[Prosecutor.] [I]f he were in the courtroom, would he realize that he was sitting next to his two attorneys? He'd realize those were his attorneys?

[Doctor.] I believe so, yes.

[Prosecutor.] And he would know that we're the prosecution?

[Doctor.] If so advised, yes.

[Prosecutor.] Yeah. And he would know that we're trying to find him—have him found guilty, and he'd know they're trying to help him be found not guilty?

[Doctor.] I believe so.

[Prosecutor.] Now, after you administered the medication to him, did you notice a difference in his demeanor?

[Doctor.] Yes.

[Prosecutor.] And it was what?

[Doctor.] He was calm and forthcoming with more information.

Tr. at 820. Following this testimony, McManus moved for a continuance or a mistrial. The trial court denied both motions and continued with the trial. Before recessing for the day, the State called ten more witnesses to the stand. Tr. at 839–977. That evening, McManus was once again transported to the hospital for treatment.

During the morning of May 1st, jail personnel administered two pertinent medications to McManus, Effexor and Xanax. Tracy Sander, the jail nurse, testified that these drugs would make a person very drowsy, but are routinely prescribed. Tr. at 988. Sanders also testified that she was able to communicate with McManus. McManus then renewed his motion for a mistrial. McManus's counsel added that McManus was nauseous and lightheaded. Tr. at 989. The trial court denied the motion, finding no evidence suggesting that Mc-Manus was unable to assist in his defense or participate in the trial. Tr. at 990.

As the fourth witness of the day began to testify, McManus requested a recess and complained of similar symptoms. During the recess, the trial court questioned Ken Mitz of the Vanderburgh County Sheriff's Department regarding McManus's condition. Mitz reported that McManus was in the infirmary and hyperventilating. Tr. at 1059–60. The jail nurse administered a shot to McManus to ease his breathing, rendering him incapacitated for several hours. After brief argument, the trial court ordered a continuance of one week.

On May 2, 2002, Dr. Willard Whitehead changed McManus's medication regimen. On May 7th, the trial court held a hearing on McManus's verified motion for mistrial. As of that date, McManus was taking one milligram of Xanax three times a day, forty milligrams of Popranolol three times a day, and the antidepressant Remeron. The court called Dr. Whitehead, a psychiatrist. He examined McManus on May 2nd and May 7th. The trial court's direct examination of Dr. Whitehead proceeded in relevant part as follows:

[Court.] Well, if he is having hyperventilation episodes, do you think that the—that the treatment regimen that he is on, including the drugs that he is being—that are being administered to him are going as far as you could possibly go at this point to get him ready to sit through the trial?

. . .

[Psychiatrist.] Well, if you look at treatment for anxiety dis-anxiety problems or hyperventilation—actually, we got off the Internet a thing on managing hyperventilation. That's something as a psychiatrist I've never seen before. I called some emergency—an emergency room

doctor and talked with him about what it looked like. The only way to confirm what it is, apparently, is to check an arterial blood gas, which I don't think we could do here very well, but we got some stuff off the Internet on managing it, and one thing they said to use was a benzodiazepine like Xanax. Xanax is quick. It's effective. Much more often than not you would expect it to work. You wouldn't want to give someone so much that they would become intoxicated with it. When you get into a problem with Mr. McManus, I asked to have him checked for intoxication—and this is the only copy we have of this—but they had a Matt Hill, who is an investigator who is apparently trained in working with intoxication, examine him and he thought that Mr. McManus was not cooperating and trying to skew the findings of the evaluation towards looking intoxicated.

. . .

[Court.] The next question is, if this trial is terminated and we try him again a month from now or two months from now, is there any reason to believe that his situation would be any different then?

. . .

[Psychiatrist.] If it is an anxiety situation related to this stressor and, like he says, he wants to get this taken care of and over with, and on medication, there's a chance he would do better. In fact, that—that could happen by tomorrow. . . . You have two different treatment strategies on board. Now, you have the Xanax, which is relatively fast acting. You're doing a little bit of a tightrope between intoxicating and undertreating. You want to get the right level, but that should be doable pretty rapidly. Unfortunately, it's hard to tell if you're intoxicating him because of his

strange findings on examination. You also have a medicine called Propranolol or Inderal going which blocks adrenaline. Again, that's fast acting.

. . .

It blocks adrenaline, so if you start to get afraid, the adrenaline goes out there and just—your body stays pretty cool. So he's on that, too. That's another one that could be increased and—in fact, he's on 40 milligrams three times a day now. His blood pressure looks good, so you could increase that to be more aggressive with his treatment. I would say right now, the Xanax is equivocal because of the findings on his neurological exam. If you wanted to increase anything right now that might work quickly, it would be the Propranolol to block the fright response.

Mistrial Hearing Tr. at 12–14, 16–18. Dr. Whitehead also indicated that McManus was being uncooperative.

At the conclusion of the hearing, the trial court held as follows:

Okay. I'm going to deny the motion. I'm convinced that it's either self-induced, or if not self-induced, it's something that's caused by this trial. I think these—this—these doctors are giving him the optimum treatment he can get. I'm convinced that we're not going to face any better situation the next time than what we're facing right now and I believe we can get through this trial in a proper fashion and that's what I want to do.

Mistrial Hearing Tr. at 69. Following the denial of McManus's motion, the trial proceeded to its conclusion without incident. At the hearing on McManus's motion to correct error, Dr. Roger Maickel, an expert in forensic toxicology and pharmacology, testified that the drugs administered to McManus may impair functional cognitive

skills. Dr. Maickel based his opinions on medical records.

It is apparent that the trial court based its decision on continual reports from medical professionals who maintained contact with McManus throughout the trial. While the testimony was often equivocal, the consensus of the witnesses was that the medications assisted McManus in participating in his trial. Without the medications, McManus proved to be unable to cope with the stress of the proceeding. McManus's situation is markedly different from the defendant who requires medication to attain competence so that the trial can begin. Before trial, McManus was competent and participated in preparing his case. The administration of medication appeared to manage a sudden onset of stress, rather than to medicate a diagnosed psychosis. Reliance on psychotropic drugs during trial is obviously to be approached with great care, and competency hearings to evaluate the effects on a defendant's ability to appropriately participate in his or her defense are very important. In the case at bar, we cannot say that the trial court's competency determination was clearly erroneous and therefore affirm the denial of McManus's motion for mistrial.

### B. State's Failure to Disclose Exculpatory Evidence

McManus next contends that the State failed to disclose exculpatory evidence of the various drugs administered to him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The transcript and record are replete, however, with references to every drug administered to Mc-

Manus. Indeed, McManus moved the trial court for continuances and mistrial arguing incompetence due to improper administration of medication and proffered extensive evidence relating to McManus's medications. At moments when it mattered, evidence about McManus's medication was laid out for all to see.

### C. Newspaper Article Impeaching the Verdict

At the sentencing hearing, McManus tendered a news article purporting to relate jurors' perceptions of McManus during the trial. He contends that the trial court erred by excluding the exhibit.

■ "The trial court has inherent discretionary power on the admission of evidence, and its decisions are reviewed only for an abuse of that discretion." *Jones v. State*, 780 N.E.2d 373, 376 (Ind.2002). Indiana's Evidence Rule 606(b) reads as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify
>
> (1) to drug or alcohol use by any juror,
>
> (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or
>
> (3) whether any outside influence was improperly brought to bear upon any juror.
>
> A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be

precluded from testifying may not be received for these purposes.

McManus does not argue any of the three exceptions. He contends only that the defense was unaware of the medications administered to him and was therefore unable to account for his cool demeanor. This was not a ground for permitting impeachment of the verdict.

## IV. Appropriateness of the Sentence

[12] Because the trial court imposed the death penalty, we review the appropriateness of the sentence. The Indiana Constitution provides that "the Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Ind. Const. art. VII, § 4. "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). In a death penalty case, a court may consider only those statutory aggravators that have been charged by the State and found by the jury. In this instance, those are committing multiple murders and murdering a person under the age of twelve. Ind.Code § 35–50–2–9(b)(8) and (12).

McManus does not contest that the aggravating circumstances were proven beyond a reasonable doubt. He acknowledges that the first aggravator, commission of multiple murders, was proven at the guilt stage when the jury returned guilty verdicts on all three counts of murder. Appellant's Br. at 18. On the night of the murder, McManus admitted to his sister, his mother, and finally the police that he killed his wife and two children. At trial defense counsel acknowledged that McManus had killed his family but asserted an insanity defense. The two court-appointed psychiatrists testified that McManus was not legally insane at the time of the murders. The defense's psychiatrist testified that McManus suffered a psychotic break rendering him unable to control his actions while he was at his wife's home. There was substantial evidence, however, that McManus went to his wife's home with the intention of killing his family.

McManus further acknowledges that the evidence of the second aggravator, murder of a person under the age of twelve, was "overwhelming and uncontradicted." Appellant's Br. at 18. Defense counsel informed the jury at trial that Lindsey was born December 31, 1992, and Shelby was born March 20, 1999.

As for mitigating circumstances, the defense focused on McManus's capacity to appreciate the criminality of his actions and conform his conduct to the requirements of law and his emotional disturbance. The defense argued that his low I.Q., depression and attention deficit disorder contributed to poor problem-solving abilities, poor internal controls and poor social learning. Tr. 1694–95. The defense also argued that the stressors in McManus's life, including overwork, financial strains, his disabled child, and impending divorce, combined with these factors, leading him to see only one way out. *Id.* at 1696. In addition, the defense noted McManus's lack of a significant criminal history. Finally, the defense argued that the medication administered to McManus affected his demeanor, which may have had a negative impact on the jury and thus should be considered as a mitigating factor.

After finding that the State had proven the aggravating circumstances beyond a reasonable doubt, the trial judge considered each of the statutory mitigating circumstances. He found that McManus "was suffering from some form of depression and other mental abnormalities when

these murders were committed" that was a mitigating circumstance that "should be given some weight." Tr. of Sent. Hr. at 21–22. Based on McManus's actions and statements before and after the crime, however, the court found that these disturbances did not substantially impair "his capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law." *Id.* at 22–23. With regards to McManus's criminal history, the court found that although the record was not "lengthy," it was significant in that it included a conviction for battery against one of the victims, Melissa McManus, and therefore was not a mitigating circumstance. *Id.* at 21. Finally, the court explored whether there were any other mitigating circumstances appropriate for consideration and found that none existed. *Id.* at 23. The court concluded that the aggravating circumstances outweighed the mitigating circumstances and, giving "great weight and consideration" to the jury's recommendation and finding that it was both reasonable and appropriate, sentenced McManus to death.

We have usually regarded multiple murder as constituting weighty aggravation, and surely the weight of killing two small children is substantial. The weight of the proffered mitigation is moderate at most. We agree with the trial court's analysis and find that the aggravators were proven beyond a reasonable doubt and that they outweigh the mitigating circumstances. The sentence was an appropriate one.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.