**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**CHRIS P. FRAZIER**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana



FILED
Jul 16 2012, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STEPHEN DUANE RUSH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 48A02-1112-CR-1091 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Rudolph R. Pyle, III, Judge
Cause No. 48C01-1008-MR-309

**July 16, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Stephen Duane Rush appeals his 149-year aggregate sentence for murder, three counts of Class A felony attempted murder, and Class C felony failure to stop after an accident resulting in injury and death. He contends that the trial court abused its discretion by denying his motion for a mistrial after the State presented evidence of his post-arrest silence, there is insufficient evidence to sustain his three attempted murder convictions, and his sentence is inappropriate. Because we find that the trial court did not abuse its discretion in denying the motion for a mistrial, there is sufficient evidence to sustain the attempted murder convictions, and Rush has failed to persuade us that his sentence is inappropriate, we affirm.

**Facts and Procedural History**

Around 3:00 a.m. on August 22, 2010, Dytika Wilkerson, Kami Wilkerson, Rachelle Fairley, and Marquai Boards went to Oasis Tavern in Anderson to pick up Kami's fiancé from work. Rachelle and Kami drove together and Dytika and Marquai drove together. When they arrived at Oasis Tavern, Dytika parked her vehicle and she and Marquai walked toward Kami and Rachelle. Kami was attempting to park in an alleyway where many other vehicles were parked, but she was having trouble. Dytika got in the car to park for Kami since she was a better driver.

At the same time, Rush was driving the opposite direction down the alleyway with his girlfriend, P.J. Willis. P.J. yelled to Dytika, "Bitch, move the car." Tr. p. 506. Dytika leaned out the driver's side window and told P.J. that there was enough room to pass by. P.J. then got out of her car and said "Bitch, I said move your car." *Id.* Dytika

got out of her car, an argument ensued, and P.J. eventually walked back to Rush's car. However, Rush got out of the car and punched Dytika in the eye. *Id.* at 397.

At that time, Kami and Rachelle rushed over and a fight erupted between them and Rush. Other people who were leaving the bar also joined in the fight, saying things to Rush like, "Oh no, you're hitting a girl? You're fighting a girl?" *Id.* at 399. Rush was eventually able to escape the fight and get back to his car, but while attempting to leave, Dennis Boards, Marquai's husband, heard that Rush hit Marquai, so Dennis punched the driver's side window of Rush's car, shattering the glass. *Id.* at 406. Rush backed his vehicle away and started driving away from Oasis. Timothy Hammerlund, Dennis's friend, started to follow Rush in order to get his license plate number. Rush then made a U-turn and started driving back toward Oasis. Rush "gun[ned his car] once," struck Hammerlund, and maneuvered onto the sidewalk. *Id.* at 552. Hammerlund hit a nearby fence, bounced off the fence, and landed on the sidewalk; he felt "pretty numb" and could not move. *Id.* at 602-04.

Rush continued to drive on the sidewalk and did not swerve as he hit Marquai and Dennis. Marquai testified that she felt the impact, fell to the ground, and could not recall anything after being hit. *Id.* at 520. Dennis testified that he tried to get away from the vehicle but was struck, flipped, and landed on the ground. *Id.* at 555-56. Rush then hit Dytika with his car once, backed up, and ran over her again. Dytika was bleeding from the mouth and making a gurgling sound as she tried to breathe. Dennis attempted to perform CPR because Dytika was not breathing. At this time, Marquai was still lying on the sidewalk, not moving and with her eyes closed.

3

Anderson Police Department Officer Matthew Kopp was dispatched to Oasis Tavern where he found 75 to 100 people at the scene. Anderson Police Department Detective Doug Stanton was also dispatched to the scene, and he recalled seeing debris in the area, with vehicle parts, blood, and shoes "scattered around." *Id.* at 304, 307.

Anderson Fire Department paramedic Josh Goins responded to the scene. He testified that it was "obvious that [Dytika] was in the most grave condition" because there was "quite a bit of blood around" her head. *Id.* at 645. Dytika's left leg was also almost completely amputated, only being held together by some skin and a few ligaments. Goins stabilized Dytika's spine and transported her to St. John's hospital. Marquai, Dennis, and Timothy were taken to Anderson Community Hospital.

Dr. Benjamin Ricke treated Marquai, Dennis, and Timothy at Anderson Community Hospital. Marquai had pain in her head and abdomen and had lost consciousness. Dennis had bruising on his left hip, hand, shoulder, and ankle. Timothy had abrasions on his right upper leg and an injured thumb. All three were treated and released from the hospital that same morning.

Dr. David Soper treated Dytika at the emergency room at St. John's Hospital. Dr. Soper testified that there was blood coming out of Dytika's left ear, she had a skull fracture, a pelvic fracture, a leg fracture, and exhibited no eye movement. *Id.* at 896-98. Dytika was given Dopamine, two units of blood, and was transferred to Methodist Hospital in Indianapolis. She died a few hours later from multiple blunt force traumas to the head, chest, and pelvis. *Id.* at 949.

4

Meanwhile, Anderson Police Department Lieutenant Janice Songer learned from a witness that Rush was heading toward Indianapolis. Fishers Police Department Officer Jeremy Lindauer was given a description of Rush's vehicle and was ordered to stop Rush. Officer Lindauer spotted Rush's vehicle, waited for backup, and initiated a traffic stop. Indiana State Police Officer Brad Quakenbush arrived, smelled alcohol on Rush, and transported him to the Anderson Police Department along with his vehicle. An inspection of the vehicle revealed blood on the front hood, grill, driver's side rearview mirror, and inside the vehicle by the front console. A cooler with beer was also found inside the vehicle.

The State charged Rush with murder, three counts of Class A felony attempted murder, and Class C felony failure to stop after an accident resulting in injury and death. At trial, Officer Lindaur testified, and the following exchange took place:

Q      Okay. During the time that you were in contact with the defendant, did he make any statements?

A      Yes, ah, initially, he, he started to tell me that he was jumped by several subjects and ah, punched in the face, I believe repeatedly, and at that point, I, I told him I was not the investigating officer, he needed to reserve his statements for the officers that were doing, conducting the investigation.

Q      He didn't indicate any statements about running over anybody?

A      No, he didn't.

Q      He didn't make any statements about hitting anybody with his vehicle?

A      No, he didn't.

Q      He didn't explain the damage to his vehicle?

A     Ah, no, he didn't.

Q     You did not question him about, . . .

*Id.* at 661-62. At that point, the trial court asked counsel to approach, excused the jury, and called a recess. The trial court said "my concern was ah, whether or not there was gonna be some commenting about some post arrest silence." *Id.* at 662. The trial court found that there was no issue at that point but wanted to make sure that the testimony did not go anywhere impermissible. Rush then made a motion for a mistrial that was denied because "the State did not impermissibly comment on Mr. Rush's post arrest silence" and the State's questions "were fair questions based upon the questions you had asked of other witnesses, ah, on cross examination." *Id.* at 670.

Rush was found guilty as charged. At sentencing, the trial court found Rush's criminal history, his lack of remorse, the particularized circumstances of the crime, and the fact that there were multiple victims to be aggravating factors. *Id.* at 1064-65. There were no mitigating factors. Rush was sentenced to the advisory sentence on each charge, but the terms were to run consecutively because of the multiple victims, for an aggregate sentence of 149 years. *Id.* at 1067.

Rush now appeals.

**Discussion and Decision**

Rush raises three issues on appeal: (1) whether the trial court abused its discretion in denying his request for a mistrial after the State presented evidence of his post-arrest silence; (2) whether there is sufficient evidence to support his three convictions of Class A felony attempted murder; and (3) whether his sentence is inappropriate.

6

## I. Request for a Mistrial

Rush contends that the trial court abused its discretion by denying his request for a mistrial after the State presented evidence of his post-arrest silence. He argues that the State engaged in an impermissible line of questioning at trial, using Rush's post-arrest silence as evidence of his guilt. We disagree.

"On appeal, the trial judge's discretion in determining whether to grant a mistrial is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury." *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004), *reh'g denied*. We therefore review the trial judge's decision solely for abuse of discretion. *Id*. "After all, a mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Id*. (quotation omitted). To succeed on appeal from the denial of a motion for mistrial, a defendant must demonstrate that the conduct complained of was both error and had a probable persuasive effect on the jury's decision. *Hale v. State*, 875 N.E.2d 438, 443 (Ind. Ct. App. 2007), *trans. denied*.

Rush contends that the State's line of questioning was a violation of the principles set forth in *Doyle v. Ohio*, 426 U.S. 610 (1976). *Doyle* says that:

> while it is true that the Miranda warnings contain no express assurances that silence will carry no penalty, such assurance is implicit to any person who receives the warning. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 618. However, *Doyle* protections do not attach until *Miranda* warnings have been given. *Fletcher v. Weir*, 455 U.S. 603, 606 (1982). While states may give defendants

stronger protections under their state constitutions, Indiana has stayed in line with the federal constitutional standard; when a "defendant asserts a *Doyle* violation, he 'ordinarily bears the burden of showing that *Miranda* warnings were given prior to the post-arrest silence used by the state for impeachment purposes.'" *Lainhart v. State*, 916 N.E.2d 924, 936 (Ind. Ct. App. 2009) (citing 3 Wayne R. LaFave, *Criminal Procedure* § 9.6(a) n.47 (3d ed. 2007)).

In this case, there is no evidence in the record that Rush received his *Miranda* warnings before this conversation with Officer Lindaur. Tr. p. 654-73. Rush was under arrest and in custody at the time, but was being transported back to the Anderson Police Department so that he could be interviewed. Rush was not being questioned by Officer Lindaur; he volunteered his statements and was informed that he would later be questioned by an investigating officer. He had not yet received his *Miranda* warnings – and notably makes no argument that his statements were not admissible as a violation of *Miranda* – so the protections of *Doyle* had not yet attached. As a result, it was not improper for the State to question Office Lindaur about what Rush said and did not say to him pursuant to *Doyle*.

In *Doyle*, the Supreme Court held that the State's use for *impeachment* purposes of a defendant's post-arrest, *post-Miranda* silence violated the Due Process Clause of the Fourteenth Amendment. Although Rush's argument is based on *Doyle*, his case is different. Here, we have the State's *substantive* use in its case-in-chief of a defendant's post-arrest, *pre-Miranda* silence. Neither party has discussed the cases in which this Court has held that the State's substantive use in its case-in-chief of a defendant's post-

8

arrest, *pre-Miranda* silence violates the defendant's right to remain silent guaranteed by the Fifth Amendment. *See Peters v. State*, 959 N.E.2d 347, 353 (Ind. Ct. App. 2011) and cases cited therein. Although Rush has not presented a Fifth Amendment argument, even if he had, the State's questions constitute harmless error because the questions were brief, the State did not make any further reference to Rush's silence, and the evidence of Rush's guilt was substantial.[1] This line of questioning did not warrant the extreme remedy of a mistrial.

The trial court therefore did not abuse its discretion by denying Rush's motion for a mistrial.

## II. Sufficiency of the Evidence

Rush also contends that there is insufficient evidence to sustain his three Class A felony attempted murder convictions. Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency of the evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences draw therefrom and affirm if the evidence and those inferences constitute substantial evidence of probative value to support the verdict. *Id.* Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Id.*

---

[1] The State's *substantive* use of a defendant's *pre-arrest*, *pre-Miranda* silence may also implicate the Fifth Amendment right to remain silent. *See Owens v. State*, 937 N.E.2d 880, 892 (Ind. Ct. App. 2010) (concluding that Owens had not invoked the right to remain silent and therefore the Fifth Amendment was not implicated, but stating, "We emphasize that we do not today determine that all pre-arrest, pre-*Miranda* silences are unprotected by the Fifth Amendment and that our holding is strictly limited to the particular facts currently before us."), *reh'g denied*, *trans. denied*.

Attempt is governed by Indiana Code section 35-41-5-1, which provides in relevant part:

> (a) A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. . . .

Murder is governed by Indiana Code section 35-42-1-1, which provides in relevant part:

> A person who:
> (1) Knowingly or intentionally kills another human being . . .
> commits murder, a felony.

Therefore, in order to be guilty of attempted murder, the State had to prove that Rush took a substantial step toward the commission of murder when he drove his car at Marquai, Dennis, and Timothy with the specific intent to kill each of them.

The evidence adduced at trial shows that after a fight outside a nightclub, Rush drove his vehicle away from the scene. However, Rush then made a U-turn, "gunned his vehicle," and drove back toward the scene. He then specifically targeted the people he had just been fighting with, first hitting Timothy, who was trying to obtain his license plate number, then hitting Dennis, who had punched the window of Rush's vehicle, and then hitting Marquai, who Rush had punched in the face. Rush also hit these three people with his vehicle; intent to commit murder can be inferred from the use of a deadly weapon, and a vehicle can be considered a deadly weapon. *Johnson v. State*, 455 N.E.2d 932, 936 (Ind. 1983).

Rush argues that some of the witnesses at trial gave testimony that conflicts with this evidence. However, this is essentially asking us to reweigh the evidence, which we

will not do. The evidence presented at trial is sufficient to support Rush's three convictions for Class A felony attempted murder.

### III. Inappropriate Sentence

Finally, Rush contends that his 149-year aggregate sentence is inappropriate. He argues that the trial court abused its discretion in finding aggravating factors and that his sentence is inappropriate in light of the nature of the offense and his character. We disagree.

### A. Aggravating Factors

The trial court found as aggravating factors Rush's criminal history, the fact that there were multiple victims, the lack of remorse shown by Rush, the manner of the commission of the crime, and that Rush was in need of correctional/rehabilitative treatment that is to be provided by a penal facility. Appellant's App. p. 9. The trial court found no mitigating factors. Rush contends that the trial court abused its discretion in sentencing him by considering material elements of the offenses as aggravating factors. Specifically, he argues that the trial court erroneously considered the manner of the commission of the crimes when determining his sentence.

Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* We review the

presence or absence of reasons justifying a sentence for an abuse of discretion, but we cannot review the relative weight given to these reasons. *Id.* at 491.

While Indiana law prevents the trial court from considering elements of the crime as aggravating circumstances, *Ellis v. State*, 707 N.E.2d 797, 804 (Ind. 1999), "particular circumstances of a criminal act may constitute separate aggravating circumstances." *Vasquez v. State*, 762 N.E.2d 92, 98 (Ind. 2001). If those circumstances of the criminal act are considered aggravators, "the trial court must then 'detail why the defendant deserves an enhanced sentence under the particular circumstances.'" *McElroy v. State*, 865 N.E.2d 584, 590 (Ind. 2007) (quoting *Vasquez*, 762 N.E.2d at 98). When a circumstance of the criminal act is considered an aggravating factor, it is generally "thought to be associated with particularly heinous facts or situations." *Smith v. State*, 675 N.E.2d 693, 698 (Ind. 1996).

The trial court found the manner of the commission of the crime as an aggravating factor because of its especially heinous nature; it was not, as Rush suggests, enhancing his sentence because he committed crimes that were more severe than the lesser crimes of manslaughter. In articulating this aggravating factor, the trial court said that

> another aggravator, and that's the manner of the commission of the crime. It would be, it would have been one thing if, after he pulled out of the parking lot, he took off and sped off and hit a number of people. But, the evidence in this case was that he turned around. And that shows an intention that the jury found, that he meant to kill some folks and ended up killing a person and ran down several others.

Tr. p. 1064. The trial court was explaining that Rush had the opportunity to drive away, but he chose to turn around and run down the victims. Instead of hitting people when he

12

was driving away in a hurry, he made a U-turn with the intention of killing the people he had just been in a fight with.

This aggravating factor was appropriately considered and detailed by the trial court. The court therefore did not abuse its discretion in sentencing Rush to an aggregate sentence of 149 years at the Indiana Department of Correction.

### B. Nature of Offense and Character of Defendant

Although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007) (citing *Anglemyer*, 868 N.E.2d at 491). The defendant has the burden of persuading us that his sentence is inappropriate. *Id.* (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)).

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the

13

crime, the damage done to others, and a myriad of other factors that come to light in a given case. *Id.* at 1224.

The sentencing range for murder is forty-five to sixty-five years, with fifty-five years being the advisory term. Ind. Code § 35-50-2-3. The sentencing range for a Class A felony is twenty to fifty years, with thirty years being the advisory term. Ind. Code § 35-50-2-4. The sentencing range for a Class C felony is two to eight years, with four years being the advisory term. Ind. Code § 35-50-2-6. Here, the trial court sentenced Rush to fifty-five years for his murder conviction, thirty years for each of his three Class A felony attempted murder convictions, and four years for his Class C felony failure to stop after an accident resulting in injury and death convictions, to be served consecutively. All of the sentences were the advisory terms.

Regarding the nature of the offenses, there is nothing in the record that indicates that these sentences are inappropriate. Rush escalated an argument over parking into a physical altercation. When it appeared that he was going to leave the scene of the fight and he had every opportunity to do so, Rush turned his vehicle around and used that vehicle to run down four different individuals who had been involved in that fight. After hitting Dytika, he backed over her again, inflicting such serious injuries that it caused her death. Rush then fled from the scene. The nature of these offenses is serious.

Regarding his character, Rush has an extensive criminal history. He has eleven criminal convictions, including intimidation, battery, and criminal recklessness. P.S.I. p. 3-7. He also has eight separate arrests for battery between 1995 and 2009. *Id.* at 4-7. This shows a history of violent behavior, which manifested itself in this case where a

14

parking dispute turned into the murder of one woman and the attempted murder of three other people. Further, Rush did not show any remorse after killing Dytika, stating in the Pre-Sentence Investigation Report that "some people got hit" by his car that night. *Id.* at 8.

After due consideration of the trial court's decision, we cannot say that Rush's aggregate sentence of 149 years is inappropriate in light of the nature of the offenses and his character.

Affirmed.

CRONE, J., and BRADFORD, J., concur.