**Zachariah HOLDEN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 57A03–0903–CR–111.**

Court of Appeals of Indiana.

Nov. 9, 2009.

John Pinnow, Greenwood, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Zachariah H. Holden appeals his conviction for Class B felony robbery and adjudication as a habitual offender. Holden moved for mistrial when a juror asked the State's firearms expert a question (which the expert had already answered on direct examination) outside the courtroom during a recess in the trial. Without questioning that juror outside the presence of the other jurors, the trial court put the expert back on the stand and posed the same question to the expert. Because the expert testified substantially the same both on direct examination and when put back on the stand and because the expert's communication to the juror outside the courtroom was in fact favorable to Holden, we conclude that the trial court did not abuse its discretion in denying a mistrial, and we therefore affirm.

## Facts and Procedural History

The facts most favorable to the verdict reveal that in December 2007 Charles Wiedman, his girlfriend Brooke Honaker, and Kassondra Thornsbearry lived together in a mobile home in Kendallville, Indiana. At the time, Holden was dating Thornsbearry. Wiedman had an eight-shot stainless steel Taurus .357 magnum revolver that his brother had loaned him. Around December 1 or 2 Wiedman and Holden began planning a robbery, during which they would use the Taurus revolver. The goal of the robbery was to make money. On the night of December 3 Wiedman and Holden went to Valero Convenient Store, which is also known as Short Stop, at the intersection of State Road 9 and U.S. 6 to find out what time it closed.

On the following night, December 4, Wiedman, Holden, Honaker, Thornsbearry, and a new person, Shane Maurer, were together at the mobile home. Holden borrowed Wiedman's hooded sweatshirt bearing the name Billabong. Maurer wore a black hooded sweatshirt with a snake and dragon print on the front. Holden and Maurer left the mobile home around 11:00 p.m. with the Taurus gun, a handheld scanner that ran on AA batteries, and a backpack containing a Dewalt grinder that could be used to open a safe. Specifically, Holden was in possession of the gun. Although Wiedman took part in the planning of the robbery, he decided to stay back at the mobile home so that he could have sexual relations with Honaker and do methamphetamine.

Sherri Bailey Charles was working the closing shift at Valero on December 4. Shortly before midnight, Charles started placing the money from the cash register into the safe. The safe had a device similar to a vending machine, which allowed Charles to insert the money into the safe but prevented her from removing it.

Charles left some money in the register to finish the night's transactions. Around 11:53 p.m., two men wearing hooded sweatshirts and bandanas over their faces entered the store. One of the men was wearing a Billabong sweatshirt and the other man was wearing a dragon sweatshirt. A man pointed a gun at Charles. The men ordered Charles to lock the door and turn off the lights and threatened Charles that if she sounded any alarms, which they would know about because they had a scanner, they would shoot her. At one point, a man stopped to insert new AA batteries from the store into the scanner. A man took $107 from the cash register. When the men learned that Charles could not access the money in the safe, one man left the store to retrieve the bag from their vehicle. A man then removed a power tool from the bag and began using it to try to open the safe.

The duo's efforts in opening the safe were interrupted when Krispy Kreme deliveryman John Huston arrived at Valero around 12:15 a.m. and parked his delivery truck by the front door. When Huston attempted to open the front door with his key, Charles appeared and began yelling at him not to open the door. Charles was extremely agitated and waving her arms. Approximately thirty seconds later, Charles allowed Huston to enter the store. By this time, the two men had already escaped out the back door. Charles told Huston that two men had attempted to unlock the safe and had threatened to kill her if she did not do so. Charles was never able to identify the men because they were wearing hooded sweatshirts and bandanas over their faces. Huston never saw the men. This event, which lasted twenty-one minutes, was captured on a surveillance camera inside Valero.

Holden and Maurer returned to the mobile home between 1:30 and 2:00 a.m. They

brought the gun back with them and were wearing the same clothing. Holden told Wiedman that "things didn't go as planned." Tr. p. 425. Holden also told Wiedman that they had gone to "the gas station at [US] 6 and [State Road] 9" and that "[t]hey went in there and asked for the money." *Id.* But their plan was foiled when "the donut guy showed up." *Id.* At that time, Maurer was trying to grind through the safe, but they decided to leave. Holden was disappointed that they were only able to obtain $100 and felt like they "did it all for nothing." *Id.* at 426.

The crime was initially unsolved. In early February 2008 Detective Shawn Dunafin with the Noble County Sheriff's Department received information from Wiedman, who was in jail on unrelated charges, that assisted him in locating the backpack containing the Dewalt grinder and the Taurus revolver from Wiedman's brother. Detective Dunafin then interviewed Holden, who explained that at the time of the robbery he had recently undergone surgery to his right hand and wrist area. In fact, at the time of the robbery his pinky finger was immobilized and had an Ace bandage wrapped around it. Nevertheless, Holden said he still had some use of his right hand. Holden also told the detective that he had not associated with Wiedman for at least two years. Detective Dunafin then subpoenaed Holden's cell phone records for December 4–5, 2007. During that time period, there were twenty-three calls between Holden's and Wiedman's cell phones.

On February 13, 2008, the State charged Holden with Class B felony robbery. The State later added a habitual offender count. A jury trial was held in January 2009. During trial both Wiedman and Thornsbearry identified Holden on the surveillance video as the person wearing the Billabong sweatshirt.

Deputy Sheriff Steven Lawson testified as an expert on firearms and firearms identification. *Id.* at 388. Specifically, he reviewed two photographs of the gun used in the robbery. These images were reduced to photos from the surveillance video. Deputy Lawson testified that based on these photos, the gun used in the robbery was a six-shot Taurus .357 revolver with a six and a half inch barrel. *Id.* at 391. When asked to clarify if the gun was a six- or eight-shot revolver, Deputy Lawson explained that although Taurus made both six- and eight-shot revolvers, he could not tell by looking at the photos whether the gun used in the robbery was a six- or eight-shot revolver. *Id.* at 393.

After Deputy Lawson was released, a juror approached him in the court office during a recess and asked him if he could determine whether the gun was a six- or eight-shot revolver. This exchange was brought to the attention of the trial court, and the parties and their counsel were brought before the court. According to Deputy Lawson, he responded to the juror as follows:

> And then I made the statement that it was [a] six shot, uh, six and a half inch barrel revolver. And I said I did make that statement. However, that there's two series of those revolvers and one of them is six shot and the newer versions are available with a seven or eight shot even.

*Id.* at 397. The court then acknowledged that it had neglected to ask the jurors if they had any questions for Deputy Lawson, "[a]lthough that's not exactly the spot that we ought to be asking the questions, but in any event, . . . what I've decided to do was I've decided that, . . . we will bring the jury back in" and "I'[ll] . . . ask that question." *Id.* at 397–98. At this point, Holden moved for a mistrial because Deputy Lawson talked to a juror about an

issue directly related to the case. *Id.* at 399. The trial court denied the motion, pointing out that the situation did not involve an outside influence trying to talk to the juror. The prosecutor then suggested dismissing the juror, but defense counsel said that was not an "adequate solution." *Id.* at 400. Defense counsel continued, "I'd rather have the solution the Court suggested, frankly because we don't know [what] they may have talked about between then and now." *Id.* The prosecutor then added that the court could talk to the juror alone. The court expressed concern that perhaps some of the other jurors overheard the juror ask Deputy Lawson the question and pointed out that jurors are allowed to discuss the case during recesses in trial. Deputy Lawson chimed in that there was only one other person present during the juror's question and that that person was not a juror. *Id.* at 401. The jurors then entered the courtroom, and the following exchange occurred:

> THE COURT: All right you're all still with us, so have a seat. All right in, when you all left, uh, I did not give you an opportunity to ask you any questions of Officer Lawson. And it was, uh, came to my attention that one of you did have a question of Officer Lawson and, and asked him a question out in the hallway, uh, which is, the question has got to be in here guys, they can't be out in the hallway. So, uh, can't do that. And so what I'm going to do is I'm going to ask that question and that gives Officer Lawson an[ ] opportunity to answer the question that, uh, that not only that one of you would have asked had I given you the chance. It also gives you all a chance to ask, to write down any other questions you might have for Officer Lawson. Uh, and, and the lawyers of course will have an opportunity to ask questions as well based upon the ques-

tion I ask right now. But I, I just want to admonish you all not to, uh—I've told you to report if anybody talks to you all, uh, you, you can't talk to the witnesses either okay. So, all right. Officer, uh, and you understand you're still under oath?

A: Yes sir.

THE COURT: All right, Officer, can you look at the photos, uh, that we, that had been shown to you that, that uh, that your testimony related to and distinguish whether the weapon is a six shot or an eight shot revolver because you mentioned it had a six and a half inch barrel?

A: Yeah, honestly Your Honor I did not get t[o] examine the picture for that because that wasn't a question that, uh, Sergeant Dunafin of the Noble County Sheriff's Department asked me to identify. He asked me to identify the type of firearm it was and possibly a make and a reasonable, you know synopsis of that. I never [had] the original firearm to know whether it was or was not. Uh, the manufacture[r] produced two styles of revolvers, one being a six shot, which is the standard, uh, revolver issued or made. And then in the last ten years they developed a little bit larger frame in which they anywhere from seven to eight rounds a piece now with a .357 cartridge. So, uh, both answers, the answer to the question is two answers. There is a six shot and there is also a[n] eight shot available, uh, depending on the model of the series.

*Id.* at 401–03. Since Deputy Lawson indicated that he did not look at the photos for the purpose of determining whether the gun was a six- or eight-shot revolver, the court suggested that it could ask Deputy Lawson that question right then, and the prosecutor and defense counsel agreed. The following exchange then occurred:

THE COURT: All right, Officer Lawson, uh, you have your photos yet correct?

A: Correct, mine.

THE COURT: Yes. And, and they relate to the ones up here?

A: Correct.

THE COURT: All right. The question is, because you indicated in the last question that you hadn't looked to determine whether it was a six or an eight shot. Could you, can you look at those, uh, at the pictures from the film and tell was the pistol a six or eight shot?

A: Could I see the evidence on 34 and 35? I think that's the one that shows the actual firearm? Or no, is it the next, the next one, the, uh, black and white sir.

THE COURT: I'm going to show you all of them that we had.

A: Not being real familiar with the, being an eight shot, I can count eight markings where there should be a cartridge located in the cylinder. And the reason I'm saying that is that this frame is a little bit larger in diameter and the way the cylinder sets in the frame you can count four on one side and you can count one with the barrel and the other two would give me my eight on this. And this would be on 45 and 46. But here again, I'm not real familiar with the eight shot cylinder and I'm using the grooves, if you look at these photographs there's a groove where ... you see the long shiny spot, that's where a cartridge lies. Okay? And if you count them you got, uh, on 45 let's say, you can see one at the very top, one about the middle and one right here, plus the one that's laying in lying with the frame here and the one in the barrel. So you have one, two, three, four and then you got five, six, seven, eight. But here again, I'm not familiar with it, I'm going to tell you the truth. I'm not familiar with it and I've dealt mainly with six shot revolvers. That's my training. Yes sir.

*Id.* at 404–06.

The jury found Holden guilty of Class B felony robbery, and Holden then admitted he was a habitual offender. The trial court sentenced Holden to fifteen years for robbery enhanced by twenty years for the habitual offender finding. The trial court ordered that thirty years be served in the Department of Correction with five years served on probation. Holden now appeals.

### Discussion and Decision

 Holden raises a single issue on appeal. He contends that the trial court erred in denying his motion for mistrial because a juror questioned a witness outside the courtroom during a recess. We review a trial court's decision to deny a mistrial for abuse of discretion because the trial court is in "'the best position to gauge the surrounding circumstances of an event and its impact on the jury.'" *Pittman v. State*, 885 N.E.2d 1246, 1255 (Ind. 2008) (quoting *McManus v. State*, 814 N.E.2d 253, 260 (Ind.2004), *reh'g denied*). "A mistrial is appropriate only when the questioned conduct is 'so prejudicial and inflammatory that [the defendant] was placed in a position of grave peril to which he should not have been subjected.'" *Id.* (quoting *Mickens v. State*, 742 N.E.2d 927, 929 (Ind.2001)). The gravity of the peril is measured by the conduct's probable persuasive effect on the jury. *Id.*

 Juror misconduct involving an out-of-court communication with an unauthorized person creates a rebuttable presumption of prejudice. *Stokes v. State*, 908 N.E.2d 295, 300 (Ind.Ct.App.2009) (citing *Griffin v. State*, 754 N.E.2d 899, 901 (Ind.2001), *reh'g granted on other grounds*, 763 N.E.2d 450 (Ind.2002)). A defendant

seeking a new trial because of juror misconduct must show the misconduct (1) was gross and (2) probably harmed him. *Id;* *see also Henri v. Curto,* 908 N.E.2d 196, 202 (Ind.2009) ("To merit a new trial upon a claim of juror misconduct, the challenger 'must show that the misconduct was gross and probably harmed' the challenging party.") (quoting *Godby v. State,* 736 N.E.2d 252, 256 (Ind.2000), *reh'g denied* ).

■ The dispute in this case is not about the propriety of the juror's communication with Deputy Lawson, which everyone agrees was improper. Rather, the dispute is about the trial court's failure to grant a mistrial. The remedy of mistrial is "extreme, strong medicine that should be prescribed only when no other action can be expected to remedy the situation at the trial level." *Lucio v. State,* 907 N.E.2d 1008, 1010–11 (Ind.2009) (quotations omitted).

We first note that Holden has likely waived this issue. The prosecutor suggested replacing the juror, but defense counsel declined, finding such solution "inadequate" and agreeing with the trial court's solution instead. Tr. p. 400. This action could have remedied the situation, thus making a mistrial unnecessary. Any waiver notwithstanding, we now determine whether the juror's misconduct is sufficiently prejudicial to warrant a mistrial. Specifically, Holden argues that Deputy Lawson's "testimony became even more favorable to the prosecution after the juror approached him because he agreed the weapon could have been a six or eight shot revolver [Tr. 403]. The juror's out of court question led to the State's case against Holden becoming stronger." Appellant's Br. p. 12. However, what Holden fails to point out is that Deputy Lawson testified on direct examination that he could not tell whether the gun was a six- or eight-shot revolver. Tr. p. 393. Ac-

cording to Deputy Lawson, he told the juror in the court office during the recess that the gun was a six-shot revolver, which we note is actually favorable to Holden since Wiedman's gun is an eight-shot revolver. In any event, when Deputy Lawson was brought back into the courtroom before all the jurors and the court posed the question to him again, Deputy Lawson testified that he was not certain whether the gun was an eight-shot revolver because his experience is with six-shot revolvers. *Id.* at 405–06. Because Deputy Lawson's testimony was substantially the same both before and after the communication with the juror, it is unclear how the juror's out-of-court question led to the State's case against Holden becoming stronger. In addition, Deputy Lawson's answer to the juror in the court office was that the gun was a six-shot revolver. In light of this evidence, the juror's misconduct was not so prejudicial and inflammatory that Holden was placed in a position of grave peril to which he should not have been subjected. The trial court did not abuse its discretion in failing to prescribe the extreme, strong remedy of a mistrial.

Nevertheless, we would be remiss if we did not point out Indiana Jury Rule 24. Although the trial court spoke with Deputy Lawson regarding his communication with the juror outside the presence of the jury, the court did not speak with the juror outside the presence of the other jurors. Jury Rule 24 provides:

> If the court receives information that a juror has personal knowledge about the case, the court shall examine the juror under oath in the presence of the parties and outside the presence of the other jurors concerning that knowledge.
>
> If the court finds that the juror has personal knowledge of a material fact, the juror shall be excused, and the court shall replace that juror with an alter-

nate. If there is no alternate juror, then the court shall discharge the jury without prejudice, unless the parties agree to submit the cause to the remaining jurors.

Pursuant to the clear terms of this rule, the trial court should have "examine[d] the juror under oath in the presence of the parties and outside the presence of the other jurors concerning [her] knowledge" of the gun and possibly excused her. Even though the juror was not so examined, the trial court was informed about the situation and promptly called the parties into the courtroom outside the presence of the jurors. Deputy Lawson then testified under oath about his communication with the juror, and Holden does not suggest on appeal that the communication between Deputy Lawson and the juror transpired other than as Deputy Lawson testified. In addition, the court repeated its admonishment to the jurors as a group that they could not ask witnesses questions outside the courtroom and that it had come to the attention of the court that one juror had in fact asked Deputy Lawson a question outside the courtroom. The court then said that it was going to ask Deputy Lawson that same question. Because the court admonished the jurors and asked Deputy Lawson the very question that the juror had asked him outside the courtroom and Deputy Lawson's answers were substantially the same both on direct examination and when called back to the stand, we conclude that any error in failing to follow Jury Rule 24 was harmless.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.