**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 19 2013, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.**
Dyer, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ERNESTO ROBERTO RAMIREZ, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A05-1204-CR-224 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause No. 45G04-1101-MR-3

**February 19, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Ernesto Ramirez appeals his convictions for murder and class D felony criminal gang activity. We affirm.

**Issues**

Ramirez raises two issues, which we restate as:

    I.       whether the trial court properly denied Ramirez's motion for a mistrial due to alleged jury misconduct; and

    II.      whether Ramirez's sentence for murder is inappropriate in light of the nature of the offense and the character of the offender.

**Facts**

On January 13, 2011, Heith Coleman and his girlfriend, Kwame Johnson, decided to go to the Copper Penny Bar in Hammond to play pool. Coleman's friend, Greg Rucker, met them at the bar and started playing pool with them. Ramirez and two of his friends kept approaching the pool table and staring at Rucker and Coleman. One of Ramirez's friends started getting aggressive and said Rucker was "disrespecting his gang" by having a beer bottle in his back pocket. Tr. p. 878. Johnson told them, "We're not here for [trouble]. We're here to play some pool." Id. at 409.

Leonard Wilson did not know Ramirez's group or Coleman's group. Wilson was walking into the Copper Penny and saw Ramirez get what he thought was a weapon out of his vehicle. Wilson was concerned and asked Ramirez if there was going to be trouble. Ramirez said, "as long as you're not a Latin King you will be all right." Id. at 787. Wilson thought that Ramirez was "looking for trouble," and he watched Ramirez

2

while they were in the bar. Id. at 792. Antwoine Williams, Victor Adams, and DaJuan Tucker soon arrived at the Copper Penny and started hanging out with Coleman, Rucker, and Johnson. Wilson watched Ramirez as he was "sizing up" Williams, Adams, and Tucker. Id. at 796.

Johnson told Coleman that she wanted to leave, and Coleman said they would leave as soon as he finished his pool game. Coleman told Johnson to get his keys and jacket, and she went outside to his vehicle. Wilson then saw Ramirez hit Adams, and "all hell broke loose" in the bar. Id. at 799. During the fight, Adams was "getting the best" of Ramirez. Id. at 801. When Adams turned around and started walking away, Ramirez stabbed Adams in the neck with a knife from behind. Coleman, Adams, and the others left the bar, and Coleman realized that Adams was injured. Coleman and Johnson tried to take Adams to what they thought was a nearby hospital, but it was a closed health clinic. When the ambulance arrived at the clinic, Adams had died from a knife wound to his carotid artery. The bar's surveillance video recorded parts of the bar fight and recorded Ramirez stabbing Adams.

The State charged Ramirez with murder and Class D felony criminal gang activity. The State later added a criminal gang enhancement, alleging that Ramirez "knowingly or intentionally was a member of a criminal gang while committing a felony and committed a felony at the direction of or in affiliation with a criminal gang, contrary to I.C. 35-50-2-15." App. p. 41. A warrant was issued for Ramirez, and he was found in Joliet, Illinois, on March 2, 2011. When Ramirez was booked into the jail, he stated that he was a member of the Spanish Gangster Disciples.

3

During Ramirez's jury trial, he argued that he was acting in self-defense. On the fifth day of the jury trial, Juror 282 sent out a note stating: "I was out to eat and my neighbor called me and said that the neighbor below me heard gunshots upstairs and running around and told them I was a jury member in a case." Tr. p. 1003. The trial court held a closed hearing and questioned Juror 282. Juror 282 said that, the night before, she was at a restaurant eating dinner when her neighbor called her. Another neighbor had heard apparent gunshots and "running around" coming from Juror 282's apartment, and he had called the police. Id. at 1005. Juror 282 also learned of a suspicious vehicle in the parking lot of the restaurant where she was eating. However, the locks at her apartment did not appear to be tampered with and nothing in the apartment had been disturbed. Juror 282 stated that she was "scared" and "very uncomfortable." Id. at 1010. Juror 282 testified that she had mentioned the events to the other jurors. The trial court released Juror 282 from service on the jury, and Ramirez moved for a mistrial due to "taint[ing]" of the jury. Id. at 1015.

The trial court then questioned the remaining jurors individually. After questioning the jurors, the trial court found that the jurors could be fair and impartial. The trial court found that Ramirez had not been placed in grave peril and indicated that it had:

> no concern whatsoever at this point that the jury [had] been tainted in any fashion or form and the very fact that some jurors indicated that she should be afraid if, in fact, something occurred has nothing more to do with her taking of herself and her daughter and there is no indication that any juror is going to discriminate or in in any way hold the situation of juror 282 against Mr. Ramirez.

Id. at 1059-60. Thus, the trial court denied Ramirez's motion for a mistrial.

The jury found Ramirez guilty of murder and Class D felony criminal gang activity. In the second phase of the trial, the jury found Ramirez not guilty on the criminal gang enhancement. At the sentencing hearing, the trial court found hardship to Ramirez's dependents was a mitigating factor, but it was minimized because, even with the minimum sentence, Ramirez's children would be adults before he was released from prison. The trial court found Ramirez's criminal history was an aggravator, and the trial court did not find Ramirez's remorse to be genuine. The trial court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Ramirez to sixty-two years in the Department of Correction for the murder charge and two years for the criminal gang activity charge to be served consecutively for an aggregate sentence of sixty-four years. Ramirez now appeals.

**Analysis**

*I. Mistrial*

Ramirez argues that the trial court erred when it denied his motion for a mistrial due to alleged jury misconduct. Ramirez begins by mentioning <u>Remmer v. United States</u>, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954), in which the United States Supreme Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full

knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

The Court held that, under such circumstances, the trial court should determine the circumstances, the impact thereof upon the juror, and whether it was prejudicial, in a hearing with all interested parties permitted to participate. Remmer, 347 U.S. at 229-30, 74 S. Ct. at 451.

Our supreme court has also held that, "[w]hile a rebuttable presumption of prejudice arises from juror misconduct involving out-of-court communications with unauthorized persons, such misconduct must be based on proof, by a preponderance of the evidence, that an extra-judicial contact or communication occurred, and that it pertained to a matter pending before the jury." Currin v. State, 497 N.E.2d 1045, 1046 (Ind. 1986) (internal citation omitted). The trial court is generally in the best position to assess the honesty and integrity of a juror and his or her ability to perform in a conscientious, impartial manner. May v. State, 716 N.E.2d 419, 421 (Ind. 1999). "As such, our review of the trial court's decisions in these matters is highly deferential." Id.

Ramirez argues that, based on Holden v. State, 916 N.E.2d 223, 228-29 (Ind. Ct. App. 2009), "[a] defendant seeking a new trial because of juror misconduct must show the misconduct (1) was gross and (2) probably harmed him."[1] According to Ramirez,

---

[1] The State properly notes that the standard used in Holden and earlier cases, which requires the defendant to show that the misconduct probably harmed him, seems to conflict with the Reemer standard, which applies a presumption of prejudice. This conflict was addressed in Hall v. State, 796 N.E.2d 388, 395-96 (Ind. Ct. App. 2003) (discussing inconsistencies in Indiana cases regarding the presumption of prejudice in cases of extra-judicial communications), trans. denied. Further, in addressing Hall's habeas corpus petition, the Seventh Circuit recently addressed the issue too. See Hall v. Zenk, 692 F.3d 793 (7th Cir.

6

Holden conflicts with the general standard of review for a motion for a mistrial. In general, the denial of a mistrial lies within the sound discretion of the trial court, and reversal is required only if the defendant demonstrates that he was so prejudiced that he was placed in a position of grave peril. Gill v. State, 730 N.E.2d 709, 712 (Ind. 2000). The gravity of peril is measured by the probable persuasive effect of an impropriety on the jury's decision. Id. The trial court is in the best position to gauge the surrounding circumstances and the potential impact on the jury when deciding whether a mistrial is appropriate. Id. According to Ramirez, Holden requires the defendant to show probable harm, while the general mistrial standard requires a more stringent showing of "grave peril" as noted in Gill, 730 N.E.2d at 712.

We conclude that, regardless of which standard is applied, Ramirez is not entitled to a new trial. During the trial, Juror 282 reported to the trial court that, the night before, she was at a nearby restaurant eating dinner when her neighbor called her. Another neighbor had heard apparent gunshots and "running around" coming from Juror 282's apartment, and he had called the police. Tr. p. 1005. Juror 282 also learned of a suspicious vehicle in the parking lot of the restaurant where she was eating. The locks at her apartment did not appear to be tampered with and nothing in the apartment had been disturbed. Juror 282 testified that she had mentioned the events to the other jurors.

---

2012). The State filed a petition for certiorari with the United States Supreme Court on the issue on December 26, 2012. However, as Ramirez does not raise an issue regarding those differing standards, we will not address the issue.

7

During the trial court's individual questioning of the jurors, the trial court found little reason for concern due to Juror 282's discussion of the incident at her residence. Juror 210 said that he heard a few details of Juror 282's incident but that he was "not concerned in any way" and could "fairly do this, no problem." Id. at 1025. Juror 371 said that the incident caused her "[a] little bit [of concern], but not much" and that she could give each side a fair trial. Id. at 1027. Juror 222 said he thought the incident was a coincidence and it would not affect his ability to give each side a fair trial.

Juror 88 said he did not take much from the conversation and "things happen sometimes, I don't know what happened." Id. at 1034. He said that the incident would not affect his ability to give either side a fair trial and that he could still base his decision on the evidence presented in the courtroom. Juror 354 said "there [was] a good chance that [the incident] was coincidental" and that the incident would not affect her ability to give either side a fair trial. Id. at 1036. Juror 149 said that the incident could have been a "coincidence, dumb luck" and that he "didn't take anything one way or the other." Id. at 1039. He said that he could still give each side a fair trial.

Juror 283 said that the incident would not affect him. He mentioned that Juror 282 said the responding police officer said "she should probably get off the jury." Id. at 1042. He said that other jurors were saying the incident could be related to the trial but "everyone seemed mostly objective about it, no one really got emotional about it." Id. at 1043. Juror 186 said that Juror 282 was "nervous" and said "it might not be anything." Id. at 1044. He said the incident would not affect his ability to give each side a fair trial. Id. at 1044. Juror 216 also said that the incident would not affect his ability to give each

8

side a fair trial and that he "just [thought] it was something in her neighborhood." Id. at 1046.

Juror 367 thought the incident was a "coincidence" and said it would not affect his ability to give each side a fair trial. Id. at 1048. Juror 254 said she did not know if it was "coincidental or not" but she would be "a little hesitant too if it happened to [her]." Id. at 1049. However, she said that she could still be fair to both sides. Alternate Juror 314 said that he did not have an impression regarding the incident and that it would not affect his ability to be a fair or impartial juror.

There was no evidence that the incident at Juror 282's residence or that the car parked outside the restaurant was related to the trial in any way. There was even a question as to whether anyone had been in Juror 282's apartment. It is not clear that an extra-judicial contact or communication even occurred here or, if it did, that it pertained to a matter pending before the jury. Moreover, even if such a contact or communication occurred, we conclude that the presumption of prejudice was rebutted. Most jurors indicated that the incident was probably a coincidence. All of the jurors indicated that the incidence would not affect their ability to give either party a fair trial. The trial court had "no concern whatsoever . . . that the jury [had] been tainted in any fashion or form," and we agree. Tr. pp. 1059-60. Even if we apply the probable harm standard as Ramirez argues, we cannot conclude that the incident probably harmed Ramirez. We conclude that the trial court properly denied Ramirez's motion for a mistrial based on the incident with Juror 282.

*II. Sentence*

Ramirez argues that his sixty-two-year sentence for murder is inappropriate in light of the nature of the offenses and the character of the offender. He requests that we instead order a sentence of fifty years for his murder conviction.

Indiana Appellate Rule 7(B) provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. When considering whether a sentence is inappropriate, we need not be "extremely" deferential to a trial court's sentencing decision. Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). Still, we must give due consideration to that decision. Id. We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. Id. Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a

portion of the sentence was suspended.  Davidson v. State, 926 N.E.2d 1023, 1025 (Ind. 2010).

Our review of the nature of the offense shows that this was a senseless crime. Ramirez and his friends started harassing Coleman and his friends at the Copper Penny bar because they felt their gang had been disrespected.  A disinterested witness reported that Ramirez went to his vehicle and retrieved what the witness thought was a weapon. The witness was afraid there would be trouble in the bar and watched Ramirez.  He saw Ramirez punch Adams, which started the fight.  While Adams's back was turned, Ramirez stabbed Adams in the neck with a knife, resulting in Adams's death.

Ramirez's character also does not warrant a reduction in his sentence.  Ramirez has a criminal history of a 1995 juvenile adjudication for disorderly conduct, a 1999 conviction for Class A misdemeanor resisting law enforcement, and a 2003 conviction for Class C felony battery causing serious bodily injury for an unprovoked bar fight. Ramirez violated his probation for the resisting law enforcement conviction.  Ramirez was also allegedly involved in a 2009 bar fight at the Copper Penny and pulled a knife on a bouncer, but he was not charged in the incident.

Ramirez expressed remorse at the sentencing hearing, but the trial court did not find the remorse credible.  Ramirez was heard on jail phone calls blaming Adams's friends for failing to get him to a hospital in time to save him.  Although Ramirez denied current gang membership, the trial court found that statement "flat out untruthful."  Tr. p. 1741.  Ramirez's jail cells contained gang graffiti, and during a phone call, he bragged about gang graffiti in his cell.  During jail phone calls, Ramirez also attempted to traffic

11

controlled substances into the jail with the mother of his three children and berated her for running the air conditioning at her house instead of bringing him money to spend in jail.

Given the senseless offense, Ramirez's continued gang activity, and his lack of remorse, we cannot say that the trial court's sixty-two-year sentence for murder was inappropriate in light of the nature of the offense and the character of the offender.

## Conclusion

The trial court properly denied Ramirez's motion for a mistrial as a result of the incident with Juror 282. Further, Ramirez's sentence is not inappropriate in light of the nature of the offense and the character of the offender. We affirm.

Affirmed.

BAKER, J., and RILEY, J., concur.