


FILED

Nov 13 2024, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

James Francisco Payne,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

November 13, 2024

Court of Appeals Case No.
23A-CR-2325

Appeal from the Vanderburgh Superior Court

The Honorable Robert J. Pigman, Judge

Trial Court Cause No.
82D03-2205-F5-2862
82D03-2109-F6-4879

**Opinion by Judge Vaidik**
Judge Kenworthy concurs.
Judge Felix dissents with separate opinion.

**Vaidik, Judge.**

# Case Summary

[1] A jury found James Francisco Payne guilty of Level 5 felony battery with a deadly weapon. At trial, the judge, the deputy prosecutors, and Payne's attorney were unaware that two psychologists had recently found Payne incompetent to stand trial in two new cases filed while he was in jail for this case. Upon learning this information, Payne's attorney moved to set aside the verdict. The court stayed consideration of the motion while Payne received competency-restoration services at a state hospital. When Payne returned, the court held a hearing and then denied the motion, concluding that Payne was competent at the time of trial. Payne appeals, and we reverse. Given Payne's well-documented history of mental illness, the incompetency findings shortly before trial, and Payne's bizarre statements and conduct before, during, and after trial, the court should have found that he had been incompetent at trial and set aside the verdict.

# Facts and Procedural History

[2] In 2022, the State charged Payne with several counts of felony battery, alleging that he walked into a gas station in Evansville and beat the clerk, Ryan

Gangwer, over the head with a wrench for no apparent reason. The case was assigned to a court that had presided over many other cases against Payne from 2019 to 2021. Because the court's exposure to Payne's serious mental illness in the prior cases is relevant to this appeal, we start by summarizing those cases.

## I. Payne's prior cases with the trial court[1]

Between June and December of 2019, the State filed five misdemeanor cases against Payne. *See* Cause Nos. 82D03-1906-CM-4338, 82D03-1907-CM-4589, 82D03-1911-CM-8123, 82D03-1912-CM-8679, and 82D03-1912-CM-8808. In one of the cases (CM-4338), the State alleged that Payne went to a gas station he had been banned from, followed a woman through the parking lot, and gave her a bear hug. He was referred to Mental Health Court in two of the cases but failed to participate. In December 2019, the State moved for an evaluation of whether Payne was competent to stand trial, citing reports from the Evansville Police Department Homeless Outreach Program detailing multiple instances of strange and dangerous behavior. The trial court granted the State's motion and ordered psychologists Donna Culley and David Cerling to evaluate Payne. Both found Payne to be competent, and the court agreed. In February 2020, Payne entered into a plea agreement that resolved all five cases and required

---

[1] The trial court took judicial notice of its prior cases with Payne, *see* Tr. Vol. II p. 25, but little information from those cases is included in the record on appeal. We obtained most of the details that follow from the Odyssey case-management system.

him to get a mental-health evaluation and comply with treatment recommendations.

[4] In April and July of 2020, the State filed two felony cases against Payne. *See* Cause Nos. 82D03-2004-F6-2166 and 82D03-2007-F6-3982. In the April case (F6-2166), the State alleged that Payne had approached some kids playing outside an apartment complex, chased a young girl, punched a young boy, and fought with police. In July 2020, the trial court found Payne incompetent to represent himself and again ordered Dr. Culley and Dr. Cerling to evaluate whether he was competent to stand trial. This time, both concluded he was not. Dr. Culley noted "obsessive characteristics as well as bizarre thought content related to artificial intelligence and being monitored" and offered a diagnosis of "Delusional Disorder, Mixed type (persecutory and grandiose), with bizarre content." Dr. Cerling noted "significant psychological impairment including emotional dysregulation and delusional ideation," "unrealistic, indeed grandiose perceptions of his ability to defend himself in these legal proceedings," and "no toleration for evidence contrary to his singular point of view." A magistrate entered a formal incompetency finding, and in January 2021 the court sent Payne to Logansport State Hospital for restoration services. Payne was found to be restored in March 2021 and entered into a plea agreement in April 2021.

[5] In September 2021, the State charged Payne with Level 6 felony possession of methamphetamine and Class B misdemeanor obstructing traffic after he was found lying in the middle of the street. *See* Cause No. 82D03-2109-F6-4879.

Payne pled guilty to the felony in December 2021, and the trial court ordered a suspended sentence and probation. The plea agreement required Payne to get a mental-health evaluation and comply with any recommended treatment. Later in December and again in March 2022, the State filed petitions to revoke probation alleging that Payne wasn't complying with the mental-health requirements.

## II. This case, the Misdemeanor Cases, and the motion to set aside the verdict

In May 2022, while Payne was on probation in F6-4879, the State filed the charges in this case: Level 5 felony battery with a deadly weapon, Level 5 felony battery resulting in serious bodily injury, and Level 6 felony battery resulting in moderate bodily injury. The State also alleged that Payne is a habitual offender based on prior felony convictions. Payne was in jail throughout the proceedings.

At the initial hearing before a magistrate on May 25, Payne had this to say when asked if he understood the charges and potential penalties:

> Um. Not guilty. I do understand um, um, I think I understand what you just said but um, that, um, there is lies (inaudible) demonstrated that Christians are um, undergoing terrorism per nano technology program 18 United States Code Section 7501 which is impermissible um. We Christians are under terrorism and um, is considered a weapon of mass destruction according to Indiana Code 35 – Section 35-31.5-2-3. Before a weapon of mass destruction used for terrorism. March along and standing right now, um, um, Christians are being terrorized as we have life

emersed demonstrating that, that we Christians are being terrorized through nano technology.

Tr. Vol. II pp. 5-6. He also claimed that the "Indiana Supreme Court is a military court." *Id.* at 6. Payne said he planned to represent himself, an issue the magistrate took under advisement.

[8] A week later, the magistrate found that Payne wasn't competent to represent himself and appointed an attorney to represent him. On June 8, the trial court held a hearing where Payne reiterated his desire to represent himself. Payne was interrupting, "ranting," and "rambling" throughout the hearing. *Id.* at 22-27. The court confirmed the magistrate's decision about self-representation, explaining:

> The Court is not going to allow you to represent yourself. The Court will take judicial notice of its own docket and in numerous other cases that I have dealt with you including the prior psychological evaluations that were done. You are not competent to represent yourself. . . . Show the Court will deny the Defendant's request to represent himself. . . . Finds that he is not competent to do so based on his long history of mental illness and other considerations including his lack of, of any formal training. The certain result of him representing himself would be that he would be convicted. He's not capable of providing circumstances that would establish anything close to a fair trial for his claims. I don't know whether you, what your defense is. Apparently, you're claiming you didn't do this, that's fine. You have a defense to these charges, your Counsel will aid you in presenting that defense but that's not something you can do.

*Id.* at 25-26.

In late June, Payne sent an incoherent letter to the court. The letter referenced body-cam footage from the night of his arrest but mostly consisted of passages like this:

> AN ENTIRE PERJURIED CIVIL COURT. AS SPY WIRETAB OPT RECORD MACHINE SEEKER MONOGRAM SYMBOL SCRAPPLER SCRAMBLER TERRORISM STRATEGY SO TO ADD ON TO THE FRIVOLOUS COUNT THAT I OBTAIN IN RECORD FORM. A CRIMINAL JURY BOX MAINTAINS 13, YET, SEATS 12 JURORS; A CIVIL JURY BOX MAINTAINS 7 PROSPECT POTENTIAL JURORS; YET, RECORD SEATS 6 JURORS. TIRRE (YOU ARE NOT AT ALL ABSENT THE RULES.) ERR HAS NO REPEED (NO ONE CAN STOP MY APPROACH.)

Appellant's App. Vol. IV p. 36.

On September 16, the trial court held a hearing about Payne's refusal to submit to DNA testing and fingerprinting. Payne refused to attend. The court asked Payne's attorney if Payne appeared to understand the charges against him. Payne's attorney said she did "not believe that he is incompetent under the legal standard of incompetency. He understands that I'm his lawyer. He clearly understands that you're the Judge. He understands the prosecutor's role." Supp. Tr. p. 9. The court then noted,

> I don't think, cause I've dealt with James a lot, I don't, I haven't seen anything in this particular case or the case that preceded this really, that would give me cause to believe that he does not meet the standard of competency as set out in the Indiana Statute. . . . He tends to focus on things that he feels are most relevant or

important and to the exclusion of just about everything else, and so that's the way it has to be or he's not going to participate and that's, that's not to me, incompetency.

*Id.* at 10.

[11] In September and October, the State filed two misdemeanor cases against Payne based on alleged misconduct at the jail ("the Misdemeanor Cases"). *See* Cause Nos. 82D07-2209-CM-5325 and 82D05-2210-CM-6002. The cases weren't assigned to this trial court. Payne refused to appear for several hearings, no attorney entered an appearance for him, and no attorney was appointed to represent him. A magistrate presided over a joint hearing in the cases on October 21. Payne appeared in person, and the magistrate determined that his competency to stand trial needed to be evaluated. She appointed Dr. Culley and Dr. Kevin Hurley to do so. She did not appoint an attorney for Payne, so he remained unrepresented in those cases.

[12] Five days later, on October 26, the trial court held a progress hearing in this case. Payne was present with his attorney, but there was no mention of the fact that a competency evaluation had been ordered in the Misdemeanor Cases. Payne noted that Gangwer's DNA wasn't found on the wrench and seemed to argue that, for this reason, Payne was not required to provide a DNA sample and Gangwer was barred from appearing at trial:

> [The law] doesn't give me, it doesn't require me to [provide a DNA sample] when, when, when I have documentations at the last highest ranking of technology concerning DNA when it says that Ryan Gangwer is now excluded though I have something

that would show as if he were, radar design technology in Popular Science it shows that, that, that there is something . . . .

Tr. Vol. II pp. 30-31. The court eventually told Payne, "You've been accused of a lot of things, Mr. Payne, but now you're not making sense." *Id.* at 33. They then had the following exchange regarding Payne's failure to provide a DNA sample:

THE COURT: Mr. Payne, do you understand you're in contempt of this Court for failing –

THE DEFENDANT: I am not. I object.

THE COURT: You do not believe –

THE DEFENDANT: I'm the universal opperhouse (sic) of the reserve room throne and you know that today.

THE COURT: When the Court orders you to do something you have to do that.

THE DEFENDANT: I object. The king of the world objects.

THE COURT: I don't care whether you object.  I've overruled your objection. I've overruled your Counsel's objection.

THE DEFENDANT: And your (inaudible) machine, I overrule, and I, and I object to it.

…

THE COURT: You do not have the option of deciding on your own –

THE DEFENDANT: Yes I do. Yes I do.

THE COURT: Does the Government have –

THE DEFENDANT: I win.

THE COURT: Does the Government have the option on their own to decide which orders they're going to obey from this Court?

THE DEFENDANT: Yes they – I do.

THE COURT: Does the Government have that same right?

THE DEFENDANT:  This, this, this, this maygoner (sic) sit – that's, he's the accusator (sic). The accusator (sic) is a victim. How can the victim, how can he be a victim and also a Prosecutor? If he's an accusate (sic), he's a prosecuting accusator (sic). A prosecuting accusator (sic) is a victim because if he's making accusations . . . of immaterial and he's not an immaterial witness.

THE COURT: Mr. Payne, if I told the Government and the Sheriff they had to release you from the jail would they be entitled to say I'm not releasing Mr. Payne because we don't feel that's the right –

THE DEFENDANT: They would have to.

THE COURT: Well then what – in the same sense you have to obey an order I give you.

THE DEFENDANT: How can I obey it when you are going against your own rights? I mean you're going against your own law. If you understand that this man is excluded then he cannot fight. He – if he cannot stand trial if he's excluded. He's removed from – he, he is as to say he's a, a washed (sic), he's a motion of wash (sic).

THE COURT: Mr. Payne, you will not have a trial in this cause until you obey the Court's ruling.

THE DEFENDANT: You can't – I, I, I, I can't obey the Order because I am not a yet a [sic] conviction settlement. A conviction settlement is only when I become a contempt if, if something happens after it. I cannot be – this cannot be considered even a contempt situation because I have to be a – even – here's what I'm saying. As I am a pretrial conference specimen I can never be held in contempt or on a contempt of procedures. First of all, I have not done anything wrong. I have not even been found guilty in this case. This right here acquits me so I can, I can never be held as a, as a pretrial uh, uh, as a uh, uh, uh conviction settlement.

*Id.* at 34-36.

[13]     After the trial court told Payne he was in contempt, Payne said, "You're a universal terrorist . . . and you will be executed." *Id.* at 37. The court told Payne he had to obey the order, and Payne responded: "I won't because this, this, this maygonar (sic) solictris (sic) is, is, is not of use. It's not something – no one is

supposed to be in this place, right now. No one." *Id.* When the conversation turned to the trial date, Payne said:

> Whose going to, whose going to be the victim because that's not a witness seat, that's a victim's seat? Whose going to be the victim? There's no such, there's no such, there's no such thing as a witness. A wit, a witness is an instigator. If I have a body camera and go and ask questions . . . did you see this, did you see that that's an instigator that would, that can say anything. I (inaudible) for that, for that so called witness.

*Id.* at 38. Payne later said "I'm not in Nebraska" and "I'm of this bailiwick." *Id.* at 39. When the court said the hearing was over, Payne said, "You're done forever terrorist. My family is here to execute you." *Id.* at 42. After the hearing, Payne fought with sheriff's deputies in the hallway outside the courtroom.

[14] In the Misdemeanor Cases, Payne met with Dr. Hurley on November 2 and Dr. Culley on November 15. Dr. Culley filed her report on November 21, finding Payne was not competent to stand trial. She noted, in part:

> [Payne] exhibited loose and tangential thought processes that were not logical or lineal in nature. He would respond to questions with excessive verbiage which was often disorganized. Thought content was positive for bizarre delusional thoughts that were grandiose and persecutory in nature. Specifically, Mr. Payne described being monitored with "nanotechnology" which he described as "Due to the scientific terrorist. NASA has military and nanotechnology which is out to destroy all Christians and I'm the King of all providences of the Universe." He stated "I'm disturbed that I'm not out yet; I am under extreme terrorism; Christians are under attack by nanotechnology and eye recorder data; someone is trying to

make me a sex offender by radar, taser based router nine recordings; I was attacked by [an] imposter from Nebraska." He became tangential during various points in the interview and discussed sex offenders attacking his children and being released from prison. He frequently described himself as the "Universal Opera House King of the Universe."

…

Mr. Payne did not demonstrate an ability to share specific details and information with this examiner related to his current charges. When asked how he hope[d] his case would turn out he stated, "It has no standing; I'm covered by acquittal rank; these are over thrown." When asked how he thought the case would most likely turn out he stated, "I'm the Universal King; they have no power over court; I'm shutting them down."

…

Clinical impressions were based on this evaluation, two prior forensic interviews, and documents provided by the court. During this evaluation, Mr. Payne presented with grandiose and persecutory ideation consistent with previous evaluations completed in 2020. He has a pseudointellectual presentation, which is challenged by inaccuracies and bizarre thought content. The diagnosis being offered is Delusional Disorder, Persecutory Type and Grandiose Type, with Bizarre Content.

**With respect to competency, it is the opinion of this examiner that Mr. Payne does not presently have the capacity to demonstrate a factual understanding of most legal concepts. Likewise, he does not currently have a rational ability to effectively communicate with an attorney or assist in his defense.** With comprehensive psychiatric assessment, medication stabilization, and competency education it is likely that Mr.

Payne could be restored to competency. He does not have any intellectual barrier to competency, and he has experience with the legal system which may aid in his restoration.

Appellant's App. Vol. III pp. 13-16 (emphasis added).

[15] The same day Dr. Culley filed her report in the Misdemeanor Cases, the trial court in this case, still unaware of those competency proceedings, set the jury trial for January 9, 2023.

[16] Three weeks before that date, on December 16, Dr. Hurley filed his report in the Misdemeanor Cases. He also found Payne was not competent to stand trial, and his observations were largely consistent with Dr. Culley's. He noted, in part:

> At my recent interview with the defendant on 11/2/2022, the defendant presented as cooperative and willing to answer my questions, but preoccupied with religiously oriented delusional thought content. He also engaged in speech that was mostly disorganized, not germane to the question at hand, and which made very little sense. The defendant was unable to provide reliable/accurate responses to basically any of my questions, but he did appear to have some understanding that he had been arrested for battery.
>
> **Overall, the defendant presented as acutely psychotic at my interview and unable to communicate rationally. He appears to suffer from a schizophrenia spectrum disorder which currently interferes with his basic competency to stand trial. He does not appear capable of working with his attorney or able to rationally consider his legal options at this time.**

*Id.* at 9 (emphasis added).

[17] The jury trial in this case proceeded as scheduled on January 9, with the court, the deputy prosecutors, and Payne's attorney all apparently unaware that two psychologists had recently found Payne incompetent in the Misdemeanor Cases and that a competency hearing was set for January 26. Throughout trial, Payne repeatedly said "I object," including when his own attorney was speaking. While the State was questioning a police officer about security video from the gas station, Payne stated, "James never molested these kids. James never molested these kids. You heard what he said so quit acting stupid." Tr. Vol. III p. 53.

[18] During discussions about whether Payne would testify, Payne was asked about the security video and responded, "That will, that will be the one, that will be the one with the – where you all – where they created the, they created the video of the radar core design and then they enhanced it with a, a copiscience (sic) camcorder. That one. That one." *Id.* at 107. When Payne was told that evidence of prior batteries might be admitted, he stated, "No, no. No, no. Any false batteries, any – cannot come up because that, that would be a um, um, universal declaration of human being rights, a prejudgment against my – Article 11." *Id.* at 110. Payne's attorney advised him not to testify, but he insisted. He also insisted on wearing his jail attire while testifying. Just before he took the stand, he stated:

> I know there might be some terrorism audio rack, rack of
> recordings in here and bass coms and um, trens (sic), double

boxes and um, um, um, enter – what is it? Rubik's cube boxes and, and, and out record out machines and, and, and voice (inaudible) and all that s*** but it shouldn't be. We understand that. It's a terrorism against my name and all that.

*Id.* at 114. He added, "I the royal king, universal opperhouse (sic) (inaudible) is entering the victim box showing that how I'm a victim since the State was not able to prove his case." *Id.* at 115.

[19]     When asked to state his name for the record, Payne said, "My title is king, universal opperhouse (sic) (inaudible). I am King James Francisco Payne, a victim." *Id.* at 116. Payne began his testimony by addressing the fact that Gangwer's DNA wasn't found on the wrench:

> As a foundation entry of initial argument and fictitious case introductory was laid before you, royal jury, Monday, January 09, 20 and 23, yesterday, by the Prosecutor I would like to have his name but I don't know so I was trying to respect him for the Court. Sorry. By the prosecuting accusator (sic). He very plainly, in part, captioned addressed by word performance that staged alleged victim settlement determination case file contract, Mr. Ryan Gangwer, was in fact, not a victim. Ultimately was not victimized per the accu, accusator's (sic) clear word direction, directory and sure clear understanding of the DNA saliva status collected from Mr. Ryan Gangwer never meeting the qualifications nor certification of the call of potential regim colous (sic) duty data recognition attachment to become or even being of a victimized awareness radar colous (sic) DNA regimen attender.

*Id.* at 117-18. Regarding photos of Gangwer's head injury, Payne testified:

If you'll look at it closely, closely – the things we have to do to prove our point. Uh. Look at it closely with uh, with, with, with clear eye content please and, and, and please register this in your aware commentor. You'll see that head frame cranium fits ogle perimeter perfect. I said the head frame cranium fits over, oval perimeter perfect meaning that if this person got hit in the head with a two-pound wrench, three-quarter, that can tear up metal, oh man. . . . So – and if you'll look at this, I said that no skull brain range is out of place, okay. Hair tamed stylist goo. Strains are not a piot incision. Dishevelment nor trained hairdo moved out of the body of its train of style. The open face oval cranium unveiled frees me from false blame.

*Id.* at 119-21.

[20] The rest of Payne's testimony included many more nonsensical statements. Among other things, he mentioned:

- "the victim settlement in the case"
- "the universal Declaration of Human Rights Act, Article 11"
- being "locked up into that concentration storm camp" that "executes people in its two hundred range (inaudible) room"
- being "sentenced to die"
- other people being able to see through his eyes
- "terrorism against us Christians"
- his "in-house name Jim from Kentucky"
- that "Jim's definitely not a f*g"
- him being "the injunction that shall shut down all meganar sorretitus (sic) all over the planet because this is ridiculous"
- the court being a "military court"
- "a plant drop agency or audio recordings, racket recorders, base coms and whatnot of trying to frame me"
- "clamps" that "clip to the heart" and "read the heart and simutones (sic) give off um, the false light visuals and stuff like that and whatnot and they send it to your brain"

- "science medical technicians liking to try to lazer [sic] deterrents to my CBO cortex (inaudible) department to try to stand that down"
- a "death certificate record, inmate record reserve, death welfare seal"
- that "I want to die" and "I'm supposed to die by this"
- "officer uncertainty of power of suggestion, suggestiveness, procedural possible discriminatorial (sic) guesswork identity"
- that "no essential court may branch assemble record operation"
- that a "central office actually released a branched operation" and has "canines"
- that Gangwer had "no head frame cranial bits, oval perimeter perfectly and there's no card grains"
- that the security video was "created" using "radar core design," including "by enhancement of Popular Science"

*Id.* at 122, 123, 125, 127, 132, 135, 138, 139, 140, 141, 142, 146, 148, 156, 157.

[21]    Payne said this about DNA evidence:

> DNA ocolous regim (sic), a DNA colous regim (sic) is a, a, a, is a – of the DNA data base that, that um, that is pricked from all infant's heels during I think their pregnancy of women's (inaudible) spittul under um, um, under the caption, title, heading of the internet as I got the information the other day of one of my friends' royal sons helped me in the, in the concentration storm camp here in Vanderburgh where I'm locked up at illegally. Um. He looked up, um, under um, Deaconess Women's Hospital pregnancy and pregnancy source. Looked up under um, that, that babies because I was looking up, I was looking up for um, DNA of ocolous regim (sic) which reads that infants coming out of the womb when they get they, you know they get their shots and stuff like that, end up getting their shots from the heels and they – from their heels and they take that and they put that in a – for paternity trying to find the father, you know what I'm saying. They also take that discovery and, and, and relinquish it to um, um, universal government order for the protection of – just in case someone grows up to be a terrorist or

– and for population control. So um, it's, it's a, it's a wide circle – circulating um, um, um, universal protection of universal safety and also population control for the safety of and the awareness of everyone in each region. There is 195 countries. There is 8500 providences which is states and there is 45,000 uh, citadels which are cities in which I'm king over but as um, as we understand this um, and in this um, DNA regim colous (sic) the record cannot read in, in, in this format that the DNA profile was interpreted as originated from a single unknown male.

*Id.* at 136-37.

[22] The jury found Payne guilty on all three counts of battery. During the subsequent habitual-offender phase, Payne was present at first but eventually was removed from the courtroom due to "aggressive, threatening behavior." *Id.* at 190. The jury found Payne to be a habitual offender. The court set sentencing for February 8 and ordered the preparation of a presentence investigation report.

[23] The probation department filed that report on January 26. It described an unsuccessful attempt to interview Payne:

The Court should note that the Defendant seemed detached from reality during the attempt at the pre-sentence interview. He spent 5 minutes refusing to answer any questions as he searched through a very large packet of legal paperwork that was covered in small writings the Defendant had made on them. As I explained to him that I was there to conduct his pre-sentence interview due to him being found guilty of Felony offenses, he stated "there is no such thing as a criminal court, all court is civil". Mr. Payne also stated "they began another trial after the last trial with the same jury" and implied that time he was found

not guilty. He was argumentative and disruptive as I attempted to ask him questions, and he ultimately did not answer any questions. After several attempts to get him to participate in the interview, I stated that I would ask him once more, "Have you ever been arrested outside of Vanderburgh County?", to which he replied "Did you just say something stupid? Did you say my family was in room 202 being raped?". At that point I wished the Defendant a good day and left the interview room.

Appellant's App. Vol. IV p. 162. The report also noted that the competency hearing in the Misdemeanor Cases was set for that day. Payne refused to appear for that hearing, and it was reset for February 3.

[24] Payne also refused to appear for the competency hearing on February 3. Later that day, his attorney in this case moved to set aside the verdict, having finally learned about Dr. Culley's and Dr. Hurley's incompetency findings. The trial court tried several times over the next month to hold a hearing on the motion, but Payne refused to appear. At the same time, Payne continued refusing to appear for the competency hearing in the Misdemeanor Cases. On March 14, Payne again refused to appear in the Misdemeanor Cases, and a magistrate declared him to be incompetent and ordered him to the Division of Mental Health and Addiction for restoration services.

[25] On March 16, before Payne was sent away for restoration services, the trial court in this case again attempted to hold a hearing on the motion to set aside the verdict. Payne refused to be transported from the jail, but the court was able to get him on a video call. He insisted that the motion had already been granted, stating:

I can't go to a side court because when you motion to acquit something, set aside a verdict, that means completely, totally, ultimately remove the case (inaudible) entirely. That means, that means because of a lack of standard of proof while Ryan Gangwer is excluded from the case ultimately, I can't be (inaudible). It makes no sense. Professionalism. Um. What it means is when the Court set aside the verdict because of lack of standard of proof it then the case is ultimately acquitted. (Inaudible). You are acquitted. (Inaudible) you are acquitted. (Inaudible).

Tr. Vol. III p. 205. The connection was then lost, and the court continued the hearing to the next day.

[26] When the hearing resumed, Payne appeared virtually from his jail cell. He was "yelling inaudibly" and belligerent, repeatedly stating "Stop using my window," "You're spying on me," "Stop stalking me," "Stop terrorizing me," "I'm naked," "Stand down," "Stop being a pervert," and "Get away from my door." *Id.* at 210-13. The trial court eventually ended the hearing and ruled that the proceedings would be stayed until Payne regained competency.

[27] Payne was transported to Logansport State Hospital in early April of 2023. The hospital declared him competent after two months. The trial court then held a hearing on the motion to set aside the verdict. The court denied the motion, explaining:

Throughout the proceedings the Defendant appeared numerous times. Mr. Payne has been in my Court on numerous occasions. I've had a chance to see him, talk with him. Occasionally, exchange pleasantries as we did this morning or this afternoon

and I saw no evidence that he was – lacked the competence to stand trial. There was never any concern in [] that regard brought to the Court's attention by either side. The finding in another case is what it is. I obviously can't change that.

…

[T]he finding in that other case, it is not something I can change or – but in my observations of you during that time, Mr. Payne, you're not incapable of assisting in your defense. You clearly understand how the legal system works. You testified in your own behalf. I thought your testimony, truthfully, was pretty effective. You, you answered questions and you defended your position and you understood what was important and what wasn't important and I'm going to deny the motion.

*Id.* at 218.

[28] The sentencing hearing was held a week later. To avoid double jeopardy, the trial court entered judgment of conviction on only one of the three battery counts, Level 5 felony battery with a deadly weapon. The court sentenced Payne to ten years in the Department of Correction—five years plus a habitual-offender enhancement of five years. The court also revoked Payne's probation in F6-4879 and sentenced him to time already served. The State dismissed the Misdemeanor Cases.

[29] Payne now appeals.

## Discussion and Decision

[30] Payne contends the trial court erred by finding that he was competent to stand trial and denying his motion to set aside the verdict. To be competent to stand trial, the defendant must have "the ability to understand the proceedings and assist in the preparation of the defendant's defense." Ind. Code § 35-36-3-1. In other words, the defendant must possess "the ability to consult rationally with counsel and factually comprehend the proceedings against him or her." *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004). "The trial and conviction of one without adequate competence is a denial of federal due process and a denial of a state statutory right as well." *Id.* A determination of competency to stand trial is reviewed under the clearly erroneous standard, reversed only if it is "unsupported by the facts and circumstances before the court and the reasonable conclusions that can be drawn therefrom." *Id.* at 261.

[31] Having closely reviewed the entire record, we are compelled to hold that the motion to set aside the verdict should have been granted. By the time the trial court ruled on the motion, the evidence that Payne was incompetent at the time of trial was overwhelming. The evidence can be divided into five groups: (1) Payne's previous cases before the trial court; (2) Payne's statements and conduct before trial; (3) the competency proceedings in the Misdemeanor Cases; (4) Payne's statements and testimony at trial; and (5) Payne's statements and conduct after trial.

[32] While Payne's previous cases with the trial court are the least relevant evidence of his mental state at the time of this trial, they did set a baseline: the court was well aware that Payne had a history of serious mental illness. Three years before the trial in this case, the court ordered a competency evaluation for Payne in a group of misdemeanor cases and later accepted a plea agreement that required a mental-health evaluation. Two years before the trial in this case, the court ordered another competency evaluation in two felony cases and then sent Payne to Logansport State Hospital for restoration services. One year before the trial in this case, the court was dealing with petitions to revoke Payne's probation in another felony case because of his failure to comply with mental-health services.

[33] Then came the pretrial proceedings in this case, during which Payne remained incarcerated. Payne said at his initial hearing that Christians are "undergoing terrorism per nano technology program 18 United States Code Section 7501" and that the Indiana Supreme Court is a "military court." At another hearing two weeks later, the trial court denied Payne's request to represent himself because he was "not capable of providing circumstances that would establish anything close to a fair trial for his claims." Shortly thereafter, Payne sent the court an incomprehensible letter in which he referenced, among other things, "AN ENTIRE PERJURIED CIVIL COURT," a "SPY WIRETAB OPT RECORD MACHINE SEEKER MONOGRAM SYMBOL SCRAPPLER SCRAMBLER TERRORISM STRATEGY," and the size of a civil jury.

[34] At a hearing in October 2022, Payne mentioned "radar design technology in Popular Science" while discussing DNA evidence, and the trial court told him, "[Y]ou're not making any sense." Payne referred to himself as "the universal opperhouse (sic) of the reserve room throne" and the "king of the world," referred to the prosecutor as a "maygoner," and referred to Gangwer as "a motion of wash." Payne said he couldn't obey the court's order to provide a DNA sample because "I am not a yet a [sic] conviction settlement." He said the judge is a "universal terrorist" and that his family was there to "execute" the judge. He said "this maygonar (sic) solictris (sic) is, is, is not of use" and that "no one is supposed to be in this place, right now. No one." He said "I'm not in Nebraska" and "I'm of this bailiwick." After the hearing, Payne fought with sheriff's deputies in the hallway outside the courtroom.

[35] It was during this pretrial period that the Misdemeanor Cases were filed against Payne in other Vanderburgh County courts and two psychologists found him incompetent to stand trial. The first report was filed November 21, 2022, seven weeks before the trial in this case. The report offered a diagnosis of "Delusional Disorder, Persecutory Type and Grandiose Type, with Bizarre Content" and noted that Payne "presented with grandiose and persecutory ideation" and "has a pseudointellectual presentation, which is challenged by inaccuracies and bizarre thought content." The second report was filed December 16, 2022, three weeks before the trial in this case. The report offered a diagnosis of "schizophrenia spectrum disorder" and noted that Payne was "preoccupied with religiously oriented delusional thought content," "engaged in speech that

was mostly disorganized, not germane to the question at hand, and which made very little sense," "acutely psychotic," and "unable to communicate rationally."

[36] We acknowledge the State's suggestion that Payne's mental condition might have improved in the weeks between his evaluations in the Misdemeanor Cases and his trial in this case. This seems highly unlikely, since there is no indication in the record that Payne received any mental-health treatment during the eight months he was incarcerated before trial. That said, we understand that mental competency is not a static condition, *Edwards v. State*, 902 N.E.2d 821, 827 (Ind. 2009), so the fact that Payne was incompetent weeks or years before this trial does not necessarily mean he was incompetent at the time of this trial. Therefore, we also look to whether Payne showed any signs of incompetency at trial. The trial court found there was "no evidence" of incompetency and that Payne's testimony was "pretty effective." The transcript clearly shows otherwise.

[37] Almost every time Payne opened his mouth at trial, he said something nonsensical. He declared that "James never molested these kids" even though no one had made that accusation. He spoke about "Article 11" of the "universal declaration of human being rights." He worried about "terrorism audio rack, rack of recordings in here and bass coms and um, trens (sic), double boxes," "Rubik's cube boxes," and "out record out machines." When asked his name, Payne said, "My title is king, universal opperhouse (sic) (inaudible)." Regarding Gangwer's injuries, he said, "I said that no skull brain range is out of place, okay. Hair tamed stylist goo. Strains are not a piot incision. Dishevelment nor

trained hairdo moved out of the body of its train of style. The open face oval cranium unveiled frees me from false blame." He said other people can see through his eyes. He claimed to be "the injunction that shall shut down all meganar sorretitus (sic) all over the planet because this is ridiculous." He referred to "plant drop agency or audio recordings, racket recorders, base coms," "clamps" that "clip to the heart" and "read the heart and simutones (sic) give off um, the false light visuals," and "science medical technicians liking to try to lazer [sic] deterrents to my CBO cortex (inaudible) department to try to stand that down." And he spoke extensively about DNA being pricked from infants' heels for "universal government order" and "population control." This is just a sampling of the delusional thoughts Payne shared with the court and the jury.

[38] Payne's mental struggles continued after trial. During his interview for the presentence investigation report, he "seemed detached from reality," stated "there is no such thing as a criminal court, all court is civil," and asked if the interviewer said Payne's family "was in room 202 being raped." Two months later, a magistrate declared him incompetent to stand trial in the Misdemeanor Cases after he repeatedly refused to appear for a competency hearing. In the following days, the trial court in this case tried to hold a hearing on the motion to set aside the verdict but couldn't get Payne to participate. Payne insisted the motion had already been granted and then claimed to be naked in his jail cell and accused the judge of spying, stalking, terrorizing, and being a pervert. The

court ended the hearing and said the motion would have to be put on hold until Payne was found competent.

[39] Notwithstanding this significant and disturbing evidence of incompetency, the State insists that, at trial, Payne "demonstrated that he understood the nature of the charges against him and was able to assist in his defense." Appellee's Br. p. 18. But the handful of transcript pages the State cites actually bolsters the conclusion that Payne was incompetent.

[40] Citing Transcript Volume III, page 106, the State claims that "Payne sought to testify at trial because he believed that the DNA analyst's testimony was exculpatory." *Id.* That transcript page shows Payne said this:

> Ryan Gangwer is excluded and, and, and because of, because of blood regim (inaudible), when (inaudible), when, when the babies – hospitals are, are pricked on the heel it has to go to a paternity for the fathers as well as the Government for, for protection of of, of the United States of America and plus the whole entire country so everyone has a blood pricky. Anytime you take a, a spittle, a smidget (sic) or a drop of blood on a DNA database system, it has to read and profile a face. I don't care what anybody says.

Tr. Vol. III p. 106.

[41] Citing the next page of the transcript, the State asserts that Payne "wanted to testify to argue that the surveillance video the State presented was falsified." Appellee's Br. p. 19. That transcript page shows Payne said the following when his attorney asked about a video he wanted to use: "That will, that will be the

one, that will be the one with the – where you all – where they created the, they created the video of the radar core design and then they enhanced it with a, a copiscience (sic) camcorder." Tr. Vol. III p. 107.

[42] Citing Transcript Volume III, pages 117-18 and 121, the State says that "Payne testified that Gangwer was not a victim based on the DNA evidence." Appellee's Br. p. 19. Those transcript pages show Payne talking about "that staged alleged victim settlement determination case file contract," "the call of potential regim colous (sic) duty data recognition attachment," "victimized awareness radar colous (sic) DNA regimen attender," and how "even after the case file has made its belief system, it is in the falsity of, of, of what they created to believe." Tr. Vol. III pp. 117-18, 121.

[43] Citing Transcript Volume III, pages 128 and 135, the State claims that Payne "reviewed the surveillance video with the jury and pointed out potential inconsistencies in the video and the State's version of events." Appellee's Br. p. 19. But those transcript pages show Payne saying two contradictory things about the surveillance video. He first said the video doesn't show Gangwer being hit or bleeding (even though it clearly shows both, *see* Ex. 4) but then claimed the State "created" the video of the "false incident." Tr. Vol. III pp. 128, 135. He added, seemingly unprovoked, "Jim's definitely not a f*g." *Id.* at 135.

[44] Citing Transcript Volume III, page 145, the State says that Payne "explained to the jury that he was not the suspect because in the 911 call Gangwer described

that the suspect was wearing a blue hat, but when Payne was taken into custody later that night, he had a camo hat." Appellee's Br. p. 19. Payne did testify about that discrepancy (with guidance from his attorney) but then immediately launched into this diatribe about his "FBI number" and his relationship with police dogs:

> This documentation says an, an, an assault in progress and they didn't reclassify in the, in the, in the reclassification nature box. They didn't reclassify it. Pro (sic) --- an assault in progress and which I didn't commit a crime in any way, shape or fashion just did not happen. Okay? Um. They have the alarm level as a one, priority one. Medical leave. The medical priority. Note there's not a number in the, in that box. I had been all my life a commontire, a commontire is someone with um, with – as, as my Y alert number, FBI – the (inaudible), if you – if you have an FBI number it says you're, you're, you're a problem. Okay but my FBI number speaks and says um, 248559WA1. That is wide alert one. That's a basic law. That means that I'm not a problem and the officials all through my life are unprivileged to advance in performance any alert, uh, uh, uh, alerts against me. Okay. And so, so in this, in this – then this became a report and at no – it says no essential court may branch assemble record operation. This, this um, this central office actually released a branched operation. They have canines. It says out with a canine so they, they release cars, um, um, um and patrol officers uh, uh, um, as um, when little dogs came out and played. Let me see. Um. Because the dogs loved me so much they didn't – if they were out they, they – you know what I'm saying. They wouldn't – they probably – they wouldn't be able to sit on me because uh, because I – even though I never committed a crime these dogs love me but that they – they wouldn't be able to sit on me because I, I play with EPD, EPD officer, EPD dogs a lot, a lot of time so I know the dogs and their strategy but because, but because um, I know the dogs, EPD dogs, um, and how they

work and how they uh, process, um, they have been friends with me for quite a while so when this – if they release any dogs they would not be – they, they wouldn't, they wouldn't attack me because I'm a good person and they, they like me but at the same time um, as um, the record shows um, these people release, release uh, release dogs out[.]

Tr. Vol. III pp. 145-46.

[45] These facts and the others detailed above lead inexorably to the conclusion that Payne was not competent to stand trial. Although he sometimes demonstrated understanding of legal concepts, his persecutory thought and one-track mind greatly limited his ability to work with counsel and aid in his defense. As a result, his trial and conviction were a denial of federal due process and a violation of Indiana Code section 35-36-3-1. *See McManus*, 814 N.E.2d at 260. We must therefore reverse the conviction and habitual-offender finding in F5-2862 and the revocation of probation in F6-4879 and remand for further proceedings in both cases. We caution all involved in those proceedings to closely monitor Payne's mental state and to ensure he is competent before any re-trial or probation-revocation hearing.

[46] Reversed and remanded.

Kenworthy, J., concurs.

Felix, J., dissents with separate opinion.

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Fishers, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Caroline G. Templeton
Supervising Deputy Attorney General
Indianapolis, Indiana

**Felix, Judge, dissenting.**

[47] I respectfully dissent. Payne has not shown that the trial court clearly erred by denying his motion to set aside the verdict. Accordingly, I would affirm the trial court's decision.

[48] On appeal, Payne claims his motion to set aside the verdict was brought pursuant to Indiana Trial Rule 50(A). Such motions challenge only the sufficiency of the evidence supporting the judgment or verdict. *See* Ind. Trial Rule 50(A). Here, Payne challenged his convictions based on his alleged incompetence to stand trial, so his motion was in substance a motion for relief from judgment under Trial Rule 60(B) and should be treated as such.

[49] Because the trial court entered findings and conclusions within the Chronological Case Summary in ruling on Payne's motion to set aside the verdict, a two-tiered standard of review applies here. *See Tibbs v. State*, 59 N.E.3d 1005, 1019 (Ind. Ct. App. 2016) (citing *Stonger v. Sorrell*, 776 N.E.2d 353, 358 (Ind. 2002)). First, this court determines "whether the evidence supports the findings and then whether the findings support the judgment." *Id.* (citing *Stonger*, 776 N.E.2d at 358). The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* (citing *Stonger*, 776 N.E.2d at 358). This court "may not reweigh the evidence or reassess the credibility of the witnesses." *Id.* (citing *Stonger*, 776 N.E.2d at 358). Instead, this court "must accept the ultimate facts as stated by the trial court if there is evidence to sustain them." *Id.* (citing *Stonger*, 776 N.E.2d at 358).

The trial court denied Payne's motion to set aside the verdict because it determined Payne had been competent to stand trial. Payne argues this determination was error. To determine whether a defendant is competent to stand trial, the trial court must decide "whether the defendant has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding, and whether the defendant has a rational as well as a factual understanding of the proceedings against him." *State v. Davis*, 898 N.E.2d 281, 284 (Ind. 2008) (quoting *Adams v. State*, 509 N.E.2d 812, 814 (Ind. 1987)). This court views a trial court's competency decision "from a deferential perspective" and will reverse that decision only "if it was clearly erroneous, unsupported by the facts and circumstances before the court and the reasonable conclusions that can be drawn therefrom." *McManus v. State*, 814 N.E.2d 253, 260–61 (Ind. 2004) (quoting *Brewer v. State*, 646 N.E.2d 1382, 1384 (Ind. 1995)).

Whether a defendant was competent to stand trial is an issue that "may be raised at any time, including long after trial, conviction, and sentencing have occurred." *Smith v. State*, 443 N.E.2d 1187, 1189 (Ind. 1983) (citing *Evans v. State*, 261 Ind. 148, 300 N.E.2d 882 (1973); *Tinsley v. State*, 260 Ind. 577, 298 N.E.2d 429 (1973)). However, a defendant's "[m]ental competency is not a static condition and is to be determined at the time of trial." *Edwards v. State*, 902 N.E.2d 821, 827 (Ind. 2009). Not every occurrence of behavior that may be considered "outside the norm" is a compelling indicator that the defendant is incompetent to stand trial, but such occurrences may have a "cumulative effect." *Mato v. State*, 429 N.E.2d 945, 947 (Ind. 1982). Accordingly, the trial

court's "observations of a defendant in court can be an adequate basis for finding that a competency hearing is not necessary." *Isom v. State*, 170 N.E.3d 623, 653 (Ind. 2021) (quoting *Cotton v. State*, 753 N.E.2d 589, 591 (Ind. 2001)). This is particularly true where, as here, no petition for a competency hearing was filed. *See Mato*, 429 N.E.2d at 947.

[52] Additionally, the trial court, in its role as factfinder, may discredit or disregard an expert's testimony and opinions regarding a defendant's competency. *See Barcroft v. State*, 111 N.E.3d 997, 1003 (Ind. 2018) (citing *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010)) ("Even when experts are unanimous in their opinion, the factfinder may discredit their testimony—or disregard it altogether—and rely instead on other probative evidence from which to infer the defendant's sanity."); *Galloway*, 938 N.E.2d at 709 (citing *Cate v. State*, 644 N.E.2d 546, 547 (Ind. 1994)); *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) (concluding the factfinder is "entitled to decide whether to accept or reject testimony that represents a witness's opinion," including an expert witness's opinion).

[53] It would be a fool's errand to attempt to suggest that Payne was coherent and logical throughout the entire proceedings. This dissent will not attempt such a feat. Payne said certain things that can only be described as bizarre and unintelligible as the majority recorded and is rightfully concerned with.

[54] However, the record also contains evidence that Payne was competent. There is no indication in the record that Payne or his public defender raised any

concerns to the trial court about Payne's competency before filing the motion to set aside the verdict.[2] At a pre-trial hearing on September 16, 2022, Payne's public defender indicated to the trial court that she had no concerns about Payne's competency: she did "not believe that he is incompetent under the legal standard of incompetency. He understands that I'm his lawyer. He clearly understands that you're the Judge. He understands the prosecutor's role. He has documents in a file folder that he keeps with him." Supp. Tr. Vol. II at 9. Plus, this public defender had represented Payne in at least one prior criminal case. Therefore, she had more experience with Payne than simply in this case.

[55] The State points out in its brief that Payne wanted to testify at trial in part because he wanted to highlight the DNA analyst's testimony, which he believed was exculpatory. Before taking the stand, Payne told the trial court,

> [The prosecutor] completely lost yesterday even if, even in his early initial argument he said for the record – what did you say, cut it off. Okay. He said for the record we understand that there was no DNA content on the wrench of Ryan Gangwer. He told the jury that. That killed the case. Ain't no such thing as going further.

Tr. Vol. III at 112. And when he testified, Payne noted that the State's DNA evidence "did not show any way shape or a fashion a DNA regimen of Ryan

---

[2] As a matter of fact, at the September 16, 2022, pretrial hearing, Payne's counsel explained, "[H]e did mention to me at my last visit on the 7th of September that he knew that the Court was going to order him to be evaluated and say he was crazy. He said he wasn't crazy." Supp. Tr. Vol. II at 10. This suggests that Payne's counsel and Payne had discussed the potential of requesting competency proceedings but chose not to pursue that option.

Gangwer." *Id.* at 118. Payne believed that the absence of the victim's blood on the wrench, which was used to beat on the victim's face, was an important part of his defense. That belief was not irrational and is evidence that Payne had an understanding of potential defenses to the charged crime in this case.

[56]    As the majority sets out in detail, the trial court had observed Payne in court on numerous occasions and had a long history of interacting with Payne in that setting. At the September 2022 pre-trial hearing, the trial court noted,

> . . . I've dealt with James a lot . . . . I haven't seen anything in this particular case or the case that preceded this really, that would give me cause to believe that he does not meet the standard of competency as set out in the Indiana Statute. I think he has a clear understanding of the nature of the charges. He knows he's alleged to have struck someone in the head with a wrench and the particulars concerning that. He knows obviously that that's illegal. Um, he has a better than average understanding of Court procedures in terms of . . . [w]hat goes on and how it goes on. . . . He tends to focus on things that he feels are most relevant or important and to the exclusion of just about everything else, and so that's the way it has to be or he's not going to participate and . . . that's not to me incompetency.

Supp. Tr. Vol. II at 10. Similarly, in denying Payne's motion to set aside the verdict, the trial court made the following statement:

> Throughout the proceedings the Defendant appeared numerous times. Mr. Payne has been in my Court on numerous occasions. I've had a chance to see him, talk with him. Occasionally, exchange pleasantries as we did this morning or this afternoon and I saw no evidence that he was – lacked the competence to stand trial. There was never any concern in . . . that regard

brought to the Court's attention by either side. The finding in another case is what it is. I obviously can't change that. . . . [I]n my observations of you during that time, Mr. Payne, you're not incapable of assisting in your defense. You clearly understand how the legal system works. You testified in [sic] your own behalf. I thought your testimony, truthfully, was pretty effective. You . . . answered questions and you defended your position and you understood what was important and what wasn't important . . . .

Tr. Vol. III at 218.

[57] Although the trial court clearly expressed concern about Payne's ability to represent himself at the beginning of this case, that inquiry is separate from Payne's ability to understand the proceedings and assist in the preparation of a defense, *see Edwards*, 902 N.E.2d at 824. In fact, both Dr. Hurley and Dr. Culley noted in their reports that Payne was well aware of and understood the charges against him in this case. When Dr. Hurley asked Payne about his charges in this case, Payne told Dr. Hurley that the court had ordered him to submit to DNA testing but he had refused to do so and that his case should be dismissed because Gangwer's DNA was not found on the wrench. Dr. Culley reported that Payne "initially wanted to discuss the original charge which resulted in his current incarceration rather than the charges which are the focus of this court order. He required frequent redirection to the charges which are the subject of this evaluation," that is, the misdemeanor charges. Appellant's App. Vol. IV at 218. In other words, Payne was focused on his defense to the charges in this case to the exclusion of any misdemeanor charges, which is likely a part of the reason the doctors found him incompetent in the misdemeanor causes.

[58] Furthermore, because mental competency is determined at the time of trial, *Edwards*, 902 N.E.2d at 826, Dr. Culley's conclusion in November 2022 and Dr. Hurley's conclusion in December 2022 that Payne was not competent to stand trial in the misdemeanor causes are not determinative of whether Payne was competent to stand trial on January 9 and 10, 2023, in this case. In the absence of evidence tending to show that Payne's mental state either improved or diminished between the dates he was evaluated and the date of his trial, it is imperative that we rely on the trial court's observations of Payne during that time as much, if not more so, than the cold record.[3]

[59] Moreover, it was within the trial court's discretion to discredit or disregard Dr. Hurley's and Dr. Culley's conclusions, and it was also within the trial court's discretion to weigh its own observations of Payne before, during, and after trial against the doctors' conclusions and determine that its observations outweighed those conclusions. *See Isom*, 170 N.E.3d at 653 (quoting *Cotton*, 753 N.E.2d at 591); *Barcroft*, 111 N.E.3d at 1003 (citing *Galloway*, 938 N.E.2d at 709); *Galloway*, 938 N.E.2d at 709 (citing *Cate*, 644 N.E.2d at 547; *Thompson*, 804 N.E.2d at 1149). This court cannot reassess Dr. Hurley's and Dr. Culley's credibility, nor can it reweigh the evidence. *See Tibbs*, 59 N.E.3d at 1019 (citing *Stonger*, 776 N.E.2d at 358).

---

[3] During the trial, it was Payne who—over his own counsel's inaccurate advice—argued that the State could not cross-examine him about his prior crimes of dishonesty because those prior crimes occurred more than ten years prior. *See* Ind. Evidence Rule 609(b). In fact, during this exchange, Payne contended that the use of his priors would be "prejudicial" and a violation of a "motion in limine." Tr. Vol. III at 103–04 ,109.

Most importantly, and the reason for this dissent, when there is conflicting evidence concerning a defendant's competency, this court must look to the evidence *supporting* the trial court's decision; it is only when that decision is wholly unsupported that we may reverse. *McManus*, 814 N.E.2d at 260–61 (quoting *Brewer*, 646 N.E.2d at 1384). Instead of focusing on the evidence that the trial court could have used to make a decision regarding Payne's alleged incompetency, we should be determining whether there was evidence of his competency. *See id.* Based on my review of the record, I conclude there is evidence in this record supporting the trial court's determination that Payne was competent to stand trial on January 9 and 10, 2023. Therefore, the trial court did not clearly err in making this decision and thus did not clearly err in denying Payne's motion to set aside the verdict. I would affirm the trial court's denial of that motion.[4]

Accordingly, I respectfully dissent.

---

[4] Because the majority does not reach Payne's other claims, I will not address them here other than to note that I would conclude they do not have merit.